In re **RICHARD BUICK, INC.,** Debtor.

**Bankruptcy No. 90–12419S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 9, 1991.

Richard H. Anderson, Friedman & Anderson, Media, Pa., for debtor.

Shawn J. Lau, Reading, Pa., for Meridian Bank.

Joseph M. Gindhart, Philadelphia, Pa., for United Services Auto. Ass'n.

Michael D. Power, Griffith & Burr, P.C., Bala Cynwyd, Pa., for Volvo.

Nicholas J. Lamberti, Asst. Counsel, Pa. Dept. of Revenue, Office of Chief Counsel, Harrisburg, Pa., for Pa. Dept. of Revenue.

James J. O'Connell, Philadelphia, Pa., Ass't. U.S. Trustee.

Robert Szwajkos, Elliot H. Berton, Philadelphia, Pa., for Gen. Motors Acceptance Corp.

Nora D. Dowd, Deputy Atty. Gen., Com. of Pa., Office of Atty. Gen., Bureau of Consumer Protection, Philadelphia, Pa., for Pa. Bureau of Consumer Protection.

Jeffrey Kurtzman, Philadelphia, Pa., for Gen. Motors Corp.

Frederic Baker, Dist. Counsel, I.R.S., Philadelphia, Pa., for I.R.S.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before us is the request of RICHARD BUICK, INC. ("the Debtor") that we confirm its First Amended Plan of Reorganization ("the Plan"), despite the presence of a critical adverse vote and Objections to confirmation by GENERAL MOTORS ACCEPTANCE CORPORATION ("GMAC"), the Debtor's principal secured creditor. We find that the ballot and Objections of GMAC were not timely, even upon application of Bankruptcy Rule ("B.Rule") 9006. However, we also find that, in our discretion, we may consider any pertinent issues raised by the Objections.

Applying these principles in analyzing the Plan, we conclude that the Debtor has complied with 11 U.S.C. § 1129(a)(7); and with § 1129(a)(8), rendering 11 U.S.C. § 1129(b) inapplicable. We also find that the Debtor did not improperly classify certain claims as priority claims and thus did not improperly give them favored treatment, in violation of 11 U.S.C. § 1122(b). However, we conclude that we must deny confirmation of the Plan because the misclassification of the divergent secured creditors in one class under the Plan violates 11 U.S.C. § 1122(a).

### B. FACTUAL AND PROCEDURAL HISTORY

In 1973, the Debtor began its business of selling and servicing new and used motor vehicles at its present location, 4005 West Chester Pike, Newtown Square, Delaware County, Pennsylvania 19073. By 1988, the Debtor and related entities had acquired several dealer franchises which were operating out of three locations, including Volvo and the Buick franchises at the instant location and other franchises at a location owned by Heritage Nissan, Inc. ("Heritage"), a related entity which is presently in a Chapter 11 case, at Bankr. No. 90–02418F, which has been assigned to our colleague, the Honorable Bruce Fox. Richard Silverman ("Silverman") is the president, chief operating officer, and principal

shareholder of the Debtor as well as Heritage. The remaining shareholder of the Debtor, as well as Heritage, is Silverman's wife, Claire Silverman ("Claire"), who is vice president and treasurer of the Debtor and is employed on a daily basis in a management capacity.

In November, 1988, Silverman had a serious heart attack, from which he has now recovered, which made it impossible for him to work for an extended period. Allegedly because of Silverman's inability to work, and several ill-advised decisions by parties delegated to make decisions in his place, as well as a general recession in the motor-vehicle sales industry generally, the Debtor and Heritage were compelled to file voluntary Chapter 11 petitions on June 8, 1990. Although the Debtor had, prior to its filing, been experiencing difficulties in its automotive sales department, the service and parts aspect of the business was doing well, and continues to do well at present.

On June 13, 1990, just five days after the case was filed, GMAC filed two expedited motions, one seeking to restrict the Debtor's use of cash collateral, and the other requesting relief from the automatic stay to foreclose upon its security interests in the Debtor's vehicles and parts. These matters were listed for hearings on June 19, 1990. They resulted in an agreed interim cash collateral Order of June 19, 1990, allowing the Debtor to use GMAC's cash collateral, under certain conditions, until July 5, 1990, and, thereafter, pursuant to a further stipulated Order of July 5, 1990. The latter Order required, *inter alia*, that the Debtor provide GMAC with an Agreement of Sale of its assets acceptable to GMAC, or make payment on its "cash equivalent" of all sums due to GMAC, by August 13, 1990, or be obliged to surrender to GMAC all of its secured vehicles on that date. On August 15, 1990, we denied the Debtor's motion seeking relief from this Order. GMAC removed the vehicles. Thereafter, the Debtor continued in business as only a repair facility.

On September 20, 1990, GMAC filed a further motion seeking relief from the stay to enforce its alleged security interest in the Debtor's parts inventory. On November 14, 1990, GMAC and the Debtor filed a Stipulation resolving this matter, which included a requirement that the Debtor promptly file a Plan of Reorganization. This Stipulation was not approved by this court, because date deadlines included in it had run before its presentation to us. GMAC has relisted its underlying motion by carrying it along with the plan process.

Other events in the case shaped the plan process. The Bureau of Consumer Protection of the Commonwealth of Pennsylvania ("the BCP") filed a proceeding seeking to establish a trust fund of sums collected by the Debtor from customers for state sales taxes, but not submitted to the Commonwealth, rendering the customers liable for sales taxes which they had already paid to the Debtor. Meridian Bank ("Meridian") claimed a similar trust-fund interest in a sum which a customer paid to the Debtor to liquidate a recent auto loan, but which the Debtor never remitted to Meridian. Another dealer instituted a proceeding requesting that the Debtor's obligations arising from failures to reimburse its sums due for balances on dealer trades of vehicles be deemed nondischargeable.

On November 20, 1990, the Debtor filed a Plan of Reorganization and Disclosure Statement. Therein, the Debtor attempted to mollify the BCP, Meridian, and the dealer-trade creditors by classifying all of these claims as priority claims to be paid in full under the Plan. By way of contrast, all secured claims were placed in one class, including those of GMAC; Provident National Bank ("Provident"), the holder of a secured claim in all of the Debtor's assets; Volvo Finance North American, Inc. ("Volvo"), which financed the Debtor's Volvo vehicles and parts; Pitney–Bowes ("Pitney"), which had sold the Debtor a postage-meter machine; A.T. & T. Credit Corp. ("AT & T"), which had sold the Debtor its telephone system; possibly Fidelity Bank ("Fidelity"), which sold the Debtor certain computer equipment; and possibly the Commonwealth of Pennsylvania's Department of Revenue ("the DOR") on account of certain tax liabilities.

Following a colloquy with counsel at the hearing on the Disclosure Statement accompanying this Plan, on January 17, 1991, this court entered an Order requiring the Debtor to amend certain aspects of the Disclosure Statement by January 30, 1991. On January 30, 1991, pursuant to that Order, the Debtor filed the Amended Plan before us, with and an Amended Disclosure Statement ("the D/S").

By Order of February 7, 1991, we approved the D/S. In that Order, we also fixed the hearing date on confirmation of the Plan as March 27, 1991; and we set March *18*, 1991, as the last day for filing acceptances or rejections of the Plan or Objections to the Plan.

On March 19, 1991, GMAC filed and served upon the Debtor a ballot rejecting the Plan and numerous Objections to confirmation. On March 21, 1991, the Debtor filed a Report of Plan Voting reciting that all classes submitting timely ballots, including the single class of secured creditors, had accepted the Plan. Excluded from the Report was the allegedly untimely vote of GMAC rejecting the Plan.

The Confirmation hearing held on March 27, 1991, began with counsel for the Debtor and GMAC addressing the status of the late-filed ballot and Objections of GMAC. We opined that the late-filed ballot could not be considered, but indicated that we would hear the Objections because we were uncertain as to our duty to independently review the Plan's compliance with all of the provisions of 11 U.S.C. § 1129 of the Bankruptcy Code.

Silverman was the first witness called by the Debtor at that ensuing hearing. Addressing the Debtor's need to give dealer-trade creditors a priority, Silverman testified that, when he had spoken to the remaining franchisors, Buick and Volvo, concerning reorganization prospects, they had both insisted that all dealers with which the Debtor had engaged in dealer trades be paid in full as a condition for renewal of their respective franchises in the future. On cross-examination, Silverman stated that the only commitment that he had made to Buick was to provide a floor plan financ-

ing. With Volvo, the Debtor had to commit to provide not only floor plan financing, but also put up $700,000.00 in working capital. The Debtor had also discussed, on the day of the Confirmation Hearing, additional terms with Volvo which would resolve the Debtor's Motion to assume the Volvo franchise sales agreement.

According to Silverman, dealer trades are a significant aspect of the automobile sales business. He stated that, in filling about thirty-five (35%) percent of consumer orders of vehicles, selling dealers are obliged to "trade" vehicles which they have in stock with other dealers to procure the precise vehicles desired by the customers. Silverman thus stated that it would be very difficult to conduct the reorganized Debtor without the cooperation of other dealers in the area who would make such trades. He admitted that, between May 25, 1990, and June 8, 1990, some of the dealers with which he had traded were not paid for traded automobiles. Some of the traded automobiles were seized by GMAC in August, 1990, when it seized all of the Debtor's stock of vehicles.

Silverman further explained that, as of June, 1990, the Debtor was having difficulty remitting sales taxes to the Commonwealth. In essence, customers would pay the Debtor for sales taxes, titles, and license tags of vehicles purchased. The Commonwealth was to be paid for these items by the Debtor within ten (10) days from the Debtor's receipt of these funds. However, the Debtor, needing the funds other purposes, did not have adequate funds to remit the appropriate sales taxes to the Commonwealth in timely fashion and so it did not do so. He also explained the circumstances which caused the Debtor to fail to remit the funds to Meridian paid to it by a customer. He contended that all of those obligations must be repaid in full if the Debtor were to retain credibility as a vendor of motor vehicles.

Silverman also testified to the present approximate value of the Debtor's parts inventory ($100,000.00), a fax machine ($300.00 to $400.00), the open account with Buick ($4,000.00), and an open account with

Volvo ($16,000.00 to $17,000.00). GMAC's counsel questioned only the testimony concerning the fax machine.

During her supplemental testimony, Claire described the terms of the two offers to buy the Debtor's assets which were made by William Stamps ("Stamps") and Richard Green ("Green"). In summer, 1990, Stamps had offered to pay $200,-000.00 for the Debtor's parts inventory and to purchase the remaining 1989 and 1990 model vehicles on the Debtor's lot. However, Stamps revoked his offer when GMAC confiscated all of the vehicles in August, 1990. Green offered to pay $200,-000.00 for the parts inventory, furniture, and fixtures, and $17,000.00 per month for use of the real estate owned by the Silvermans, with eighty-five (85%) percent of the monies being held in escrow toward the purchase of the real estate. For purposes of these transactions, the Debtor's parts inventory was valued at $175,000.

On cross-examination, Claire contended that the Buick and Volvo open accounts were not assigned to GMAC pre-petition. She stated that she did not believe that GMAC had the "right to receive funds from the open accounts," even if the Debtor defaulted upon payment on the GMAC loans. Claire did indicate that, in the past, GMAC had withdrawn approximately $60,-000.00 from the Volvo open account. Claire further testified that the Debtor had secured financing from Morgan Crowe and Associates ("MCA")[1] necessary to fund the Plan. She stated that Settlement with MCA had already occurred, although funds would not be forthcoming for several weeks. Claire stated that she was not aware of any contingencies on the financing.

Upon questioning by the court, Claire testified that the Plan complied with each of the provisions of the Bankruptcy Code. She expressed confidence that the Plan would be successful. Claire contended that, if the Debtor were liquidated, there would not be enough assets to pay all of the creditors, since all of its existing assets were pledged as collateral for various secured obligations.

GMAC opened its case by asking the court to take judicial notice of several of its prior Orders in this case, i.e., those dated June 19, 1990; July 5, 1990; and August 15, 1990, referenced at page 843 supra, which we agreed would be appropriate. Particular note was made of the fact that, in the Stipulation accompanying the June 19, 1990, Order, the Debtor acknowledged and agreed to GMAC's receipt of a super-priority administrative claim to the extent that its existing security interest proved insufficient to protect its interests.

GMAC's only witness was James Burke ("Burke"), a credit manager who is the head of three of GMAC's departments, the trucking and marine department, the wholesale department, and the leasing department. The wholesale department works actively on establishing credit lines for dealerships with floor plans and reviews financial statements and continues ongoing financial reviews of existing credit lines. In his employment capacity, Burke thus worked with the Debtor and claimed to be aware of the Debtor's security obligations to GMAC. He testified, over the objection of the Debtor and contrary to the Silvermans, that the Buick and Volvo open accounts were pledged as collateral to GMAC. However, the security documents which evidence these security interests were not introduced into evidence..

By a post-hearing Order dated March 28, 1991, GMAC and the Debtor were given until April 10, 1991, to file opening Briefs, and all interested parties were given until April 17, 1991, to file Briefs in response to the foregoing or in support of their respective positions. GMAC submitted an Opening and a Reply Brief. The Debtor submitted only a short Opening Brief. A Brief was also filed by Meridian supporting confirmation. Despite the BCP's apparent po-

---

1. Actually, Claire referred to the financier as Prudential Insurance Co. ("Prudential"). As MCA is referenced in all of the Debtor's submissions, we assume that Claire referenced Prudential because Prudential was somehow involved in procuring MCA's participation in this transaction.

sition in support of the Plan, the DOR, another agency of the Commonwealth, filed on April 4, 1991, an Objection to confirmation due to the Plan's failure to distinguish between the DOR's alleged secured priority claims of $47,735 and the balance of its filed priority claims of about $32,000.[2]

### C. DISCUSSION/CONCLUSIONS OF LAW

1. GMAC'S OBJECTIONS AND BALLOT, HAVING BEEN FILED BELATEDLY WITHOUT "EXCUSABLE NEGLECT," ARE NOT TIMELY; BUT WE NEVERTHELESS WILL EXERCISE OUR DISCRETION TO CONSIDER ALL OF THE OBJECTIONS RAISED BY GMAC.

■ GMAC stresses that this court, regardless of whether a valid objection has been filed, possesses an independent obligation to satisfy itself that the Plan meets the requirements of 11 U.S.C. § 1129(a). *See In re Quaker City Cold Storage Co.*, 71 F.Supp. 124, 128 (E.D.Pa.1947); *In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 616–17 (9th Cir. BAP 1990); *In re Mid Pacific Airlines*, 110 B.R. 489, 490 (Bankr. D.Haw.1990); *In re Sound Radio*, 93 B.R. 849, 852 (Bankr.D.N.J.1988), *aff'd in part & remanded in part*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir.1990); *In re Baugh*, 73 B.R. 414, 416 (Bankr.E.D. Ark.1987); *In re Northeast Dairy Cooperative Federation, Inc.*, 73 B.R. 239, 248 (Bankr.N.D.N.Y.1987); and *In re Martin*, 66 B.R. 921, 925 (Bankr.D.Mont.1986).

Mindful of our judicial responsibilities in this regard, we recognize our duty to review plans which may come before us. However,

[t]his duty does not ... require the court to doff its robes and assume the role of an advocate or become a grand inquisitor. It should protect and be cognizant of the rights and interests of all the parties to the proceeding. This obli-

gation does not require a detailed investigation of the debtor ... [i]nstead, the court is to act as a guardian to see that the requirements of the law have been fulfilled ... The court may base its decision upon a review of the proposed plan, together with any information submitted in conjunction with it....

*In re Dues*, 98 B.R. 434, 441 (Bankr.N.D. Ind.1989). *See also In re B. Cohen & Sons Caterers, Inc.*, 124 B.R. 642, 645–47 (E.D. Pa.1991) (objections by parties who lacked standing to object to a plan were properly not considered).

In light of this obligation, we recognize that it is within this court's discretion, in ascertaining whether the Plan satisfies the requisites of the law, to *consider* the issues raised in GMAC's untimely objection to the Plan's confirmation, despite our denial of GMAC's motion that the objection be deemed to have been timely filed. *In re Condel*, 91 B.R. 79, 80–81 (9th Cir. BAP 1988). *Cf. In re Szostek*, 886 F.2d 1405, 1411–13 (3d Cir.1989) (only certain provisions of Chapter 13 are mandatory and *must* be reviewed independently by the court). Nevertheless, it is important to determine, at the outset, whether GMAC's objections can be deemed timely filed and are hence entitled to full, as proposed to discretional, consideration.

Courts have addressed whether untimely-filed objections to confirmation can be deemed timely by relying on application of the doctrines of waiver and/or equitable estoppel and by reliance on B.Rule 9006.

■ Equitable estoppel "is triggered by 'conduct by one person inconsistent with the position later adopted by him which is prejudicial to the rights of another who relied on such prior conduct to his detriment.'" *In re Penn–Dixie Industries, Inc.*, 32 B.R. 173, 178–79 (Bankr.S.D.N.Y. 1983), quoting *In re La Difference Restaurant, Inc.*, 29 B.R. 178, 182 (Bankr.S.D.N.

---

**2.** An entity known as United Services Automobile Association ("USAA") appeared and filed a timely Objection to confirmation on the ground that it was uncertain regarding the Debtor's capacity to discharge a tort liability arising from a post-petition vehicular accident involving an employee of the Debtor which was allegedly not covered by insurance. When USAA's counsel was assured that this liability, having arisen post-petition, could not be discharged, he departed from the hearing and has not participated any further in this matter.

Y.1983), *aff'd*, 63 B.R. 819 (S.D.N.Y.1986). Also, it is necessary that the conduct of the party against which estoppel is charged *intentionally misleads* the party claiming estoppel *and* the party claiming estoppel must lack means to ascertain the true facts to permit invocation of equitable estoppel. *See, e.g., In re Atlantic Marble, Inc.*, 126 B.R. 463, 467–468 (Bankr.E.D.Pa. May 3, 1991); and *In re CS Associates*, 121 B.R. 942, 958 (Bankr.E.D.Pa.1990).

There is no evidence or indication that the Debtor misled GMAC as to the deadline for voting on, and objecting to, the Plan, or that GMAC was not fully aware of all of the deadlines established in our Order of February 7, 1991. Therefore, equitable estoppel cannot come to the aid of GMAC in these circumstances.

■ Similarly, the waiver doctrine is dependent upon the establishment by the party invoking it that there has been a voluntary relinquishment of a known right by the party charged. *See Coventry v. United States Steel Corp.*, 856 F.2d 514, 521 (3d Cir.1988); *In re Car–Gill, Inc.*, 125 B.R. 133, 21 B.C.D. 766, 768 (Bankr.E.D.Pa. 1991); *In re Bludworth Bond Shipyard, Inc.*, 93 B.R. 520, 521 (Bankr.S.D.Tex.1988); and *In re Spring Garden Foliage, Inc.*, 17 B.R. 882, 886 (Bankr.M.D.Fla.1982). There is no evidence that the Debtor ever engaged in any action which evinced an intention to waive the deadlines imposed upon its creditors by our Order of February 7, 1991. Therefore, invocation of the doctrine of waiver appears clearly inapposite.

The final, and most frequently utilized, manner of attempting to convince a bankruptcy court to consider objections to confirmation filed out of time is by resort to B.Rule 9006. Generally, B.Rule 9006[3] provides the standards for determining computation, enlargement, and reduction of time

periods for raising matters in controversies before bankruptcy courts.

The Third Circuit Court of Appeals observed, in *In re Vertientes, Ltd.*, 845 F.2d 57, 60 (3rd Cir.1988), that

> the bankruptcy court's discretion to extend time is limited to two situations—requests made before the expiration of the originally time limitation, and where failure to act was due to excusable neglect.

Since GMAC's ballot and Objections to confirmation were filed *after* the applicable deadline, GMAC must prove its failure to file timely its ballot and its Objections to confirmation was the result of "excusable neglect" by GMAC's counsel.

GMAC, in a motion requesting that its ballot and Objections be considered, recited one reason for the late filing: "On March 17, 1991, counsel responsible for filing these documents suffered a death in his family."

The term "excusable neglect," as embodied in the latter portion of B.Rule 9006(b)(1), is defined neither in the Bankruptcy Code nor in the B.Rules. In case law, it is described as a

> flexible concept and has become a term of art subject to interpretation by the trier of facts and has been defined as:
>
> "... failure to timely perform a duty due to circumstances which were beyond the reasonable control of the person whose duty it was to perform."

*In re Lewis*, 93 B.R. 462, 467 (Bankr.S.D. Miss.1987), quoting *In re Figueroa*, 33 B.R. 298, 301 (Bankr.S.D.N.Y.1983). *See also Dues, supra*, 98 B.R. at 437; *In re W & L Associates, Inc.*, 74 B.R. 681, 683 (Bankr.E.D.Pa.1987), *rev'd*, C.A. No. 87–4457 (E.D.Pa. Feb. 23, 1988); *In re Snyder*, 74 B.R. 872, 875 (Bankr.E.D.Pa.1987); *In re Carlton*, 72 B.R. 543, 545–46 (Bankr.E. D.N.Y.1987); *In re Stern*, 70 B.R. 472, 475

---

**3.** In pertinent part, B.Rule 9006(b)(1) reads:

(b) *Enlargement*

(1) *In General....* when an act is required or allowed to be done at or within a specified period by these rules or by notice given thereunder or by order of court, the court *for cause shown* may at any time *in its discretion* (1) with or without motion or notice under the

period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) *on motion after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect* (emphasis added).

(Bankr.E.D.Pa.1987); and *In re Benedict*, 65 B.R. 95, 96 (Bankr.N.D.N.Y.1986).

The excusable neglect has been construed in the context of enlargement of time for filing of proofs of claims and appeals in decisions of this court. *E.g., W & L Associates*, 74 B.R. at 683; and *Stern, supra*, 70 B.R. at 474–75. However, it has been applied as well in controversies involving objections to confirmation, such as the case at bar, by courts in other jurisdictions, *see In re Poskanzer*, 56 B.R. 207 (D.N.J. 1984); *Dues, supra*, 98 B.R. at 437–38; *Lewis, supra*, 93 B.R. at 465; *In re Snider Farms Inc.*, 83 B.R. 977, 980–81 (Bankr. N.D.Ind.1988), as well as by Judge Fox in this jurisdiction. *See Snyder, supra*, 74 B.R. at 875–76.

■ To prevail on such a contention, the objecting party must prove that its failure to file the objection in a timely manner was the result of " 'something more than ordinary diligence; it must be something that could not have been prevented by diligence (citations omitted).' " *Lewis, supra*, 93 B.R. at 467, quoting *Figueroa, supra*, 33 B.R. at 301–02. *See also Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1314–15 (8th Cir.1987); *Carlton, supra*, 72 B.R. at 543, 546; *In re Thermo Engineering Corp.*, 45 B.R. 596, 597 (Bankr.D.R.I.1984); *In re Gurney*, 20 B.R. 91, 95 (Bankr.W.D.Mo.1982); and *In re Heyward*, 15 B.R. 629, 635 (Bankr.E.D.N. Y.1981). The element most relevant in an excusable neglect analysis is whether the objector demonstrates a reasonable basis for exercise of the court's discretion, since the court may not enlarge time periods on just any equitable grounds. *See Vertientes*, 845 F.2d at 60; and *Lewis, supra*, 93 B.R. at 467.

■ Case law has developed several factors which courts have considered in analyses of the applicability of the concept of excusable neglect to certain controversies:

(1) Whether the objecting party received adequate notice. *Hanson, supra*, 828 F.2d at 1314; *Dues, supra*, 98 B.R. at 438; *Lewis, supra*, 93 B.R. at 467; *Snyder, supra*, 74 B.R. at 876; and *Heyward, supra*, 15 B.R. at 637.

(2) Whether granting the delay will prejudice the debtor or other interested parties. *In re Paul*, 101 B.R. 228, 230 (Bankr.S.D. Cal.1989); *Dues, supra*, 98 B.R. at 438; and *Snyder, supra*, 74 B.R. at 876.[4]

(3) The source and length of the delay, as well as its impact on court administration. *Paul, supra*, 101 B.R. at 230; *Lewis, supra*, 93 B.R. at 467; and *Snyder, supra*, 74 B.R. at 876.

(4) Whether the delay was beyond the reasonable control of the person whose duty it was to perform. *South Atlantic Financial, supra*, 767 F.2d at 817; *Paul, supra*, 101 B.R. at 231; *Dues, supra*, 98 B.R. at 437; *Lewis, supra*, 93 B.R. at 467; *W & L Associates, supra*, 74 B.R. at 683; *Snyder, supra*, 74 B.R. at 875; *Carlton, supra*, 72 B.R. at 545–46; *Stern, supra*, 70 B.R. at 475; and *Benedict, supra*, 65 B.R. at 96.

(5) Whether the creditor is sophisticated. *Lewis, supra*, 93 B.R. at 467.

(6) Whether the creditor acted in bad faith. *Id.*

(7) Whether the client should be penalized for counsel's mistake or neglect. *Id.*

In its submissions opposing confirmation of the Plan, GMAC emphasizes the factors

---

**4.** Several courts have discounted the significance of prejudice on the basis that the proper focus is not on the prejudicial effect of the enlargement of time on the debtor or other parties, but rather it is on the objector's actions. For example, the *Dues* court states, 98 B.R. at 437, that

> the focus of the court's inquiry is on the actions of the party seeking the additional time. *Hanson v. First Bank of South Dakota, N.A., supra*, 828 F.2d at 1315; *In re South Atlantic Financial Corp.*, [767 F.2d 814], *supra*,

at 819 [ (11th Cir.1985) ]. "[E]xcusable neglect is determined with reference to the person whose duty it was to perform." *Hanson v. First Bank of South Dakota, N.A., supra*, .... It does not depend upon a finding of any prejudice or lack of prejudice to those involved. *Matter of North American Acceptance Corp.*, 1 B.R. 438, 441 (Bankr.N.D.Ga.1979). Prejudice is not a relevant inquiry. *In re Atlantic Financial Corp., supra*, 767 F.2d at 818 [footnote omitted].

of lack of resulting prejudice to other parties in the controversy and its allegedly good reason for the short delay in making the instant filing. However, it side-stepped other factors, such as whether it received adequate notice, whether the delay was beyond its reasonable control to perform, and its sophistication.

As we noted at page 848 & n. 4 *supra*, the significance of prejudice to other parties, such as to the Debtor's interest, is not necessarily great, since this court should rightfully scrutinize objections to confirmation of the Plan in any event. Hence, the fact that GMAC notified the Debtor prior to the deadline for filing objections to the Plan of its intentions, which it argues is significant, is not nearly as significant as the fact that GMAC had received adequate notice of the deadline for filing objections. Furthermore, GMAC is not an unsophisticated participant in this bankruptcy case. Its participation in this case began as early as five days after the petition was filed, when it filed its initial motion to lift the automatic stay. Its participatory stance has not flagged throughout the case, as evidenced by its initial opposition to the Debtor's use of cash collateral and its subsequent motion to lift the automatic stay. Given this active role of GMAC throughout this case, we cannot accept its omission to adhere to the deadline for filing its ballot or Objections to the Plan as anything other than unilateral inadvertence or mistake.

The circumstance which allegedly caused the late filing, the death of a family member of counsel, was clearly beyond the control of any individual. However, in applying the concept of excusable neglect, counsel must prove its failure to timely file the objection was not preventable by the exercise of ordinary diligence. Ordinary diligence would require counsel to be cognizant of court-imposed deadlines. Although counsel's loss occurred one day before the deadline, counsel freely chose not to file its objection before that date and failed to advise associates to accomplish the filing in his absence. Such action (or failure to act) was not demonstrative of ordinary diligence. *See In re Eastern Systems, Inc.,*

118 B.R. 223, 227 (Bankr.S.D.N.Y.1990) ("when the acts of the party moving for an extension of time are the result of a freely chosen course of action, excusable neglect does not exist"). Furthermore, the "unilateral inadvertence or mistake of counsel does not fall within the definition [of excusable neglect] ... courts have held that an attorney's negligence in failing to timely file does not constitute excusable neglect." *Poskanzer, supra,* 56 B.R. at 208.

GMAC cites, in its defense, *In re Trail's End Lodge, Inc.,* 54 B.R. 898 (Bankr.D.Vt. 1984). In that case, a court deemed timely a creditor's filing of objections and a ballot filed three days after the deadline to file these items. However, in *Trail's End,* the court relied upon the absence of prejudice to the Debtor as a basis for its decision and upon analogous Vermont state law, since the "failure to receive one-day mail delivery within the state of Vermont is, ... excusable neglect...." 54 B.R. at 903. However,

> [t]he lack of prejudice to the other interest is not sufficient in itself to warrant an enlargement of time ... While the prejudicial effect on other interests may be a factor in the exercise of the court's discretion under the rule, the excusable neglect must result at least in part from the act of the party failing to perform (citations omitted).

*Hanson, supra,* 828 F.2d at 1315. Moreover, the reliance by the *Trail's End* court upon "Vermont law" as a basis for finding excusable neglect was not supported by citation to statutory law or case authority. In any event, a unique Vermont law should hardly be a basis for a decision by a Pennsylvania bankruptcy judge. For these and the foregoing reasons, we will not deem GMAC's objections to have been timely filed.

The court reaffirms its refusal, recited at the March 27, 1991, confirmation hearing, to accept GMAC's request that its ballot be considered timely submitted. Our decision is supported by case law the analysis of which mirrors our discussion concerning the application of Rule 9006(b) and the concept of excusable neglect. *See Hanson, supra,* 828 F.2d at 1314; *Paul, supra,* 101 B.R. at 230–31; *In re Arosemena,* 65 B.R.

246, 248 (Bankr.M.D.Fla.1986); *In re Mickel*, 35 B.R. 28, 30–31 (Bankr.D.S.C.1983); and *In re Elliano*, 9 B.R. 287, 289 (Bankr. E.D.N.Y.1981). Considering these relevant factors, we are obliged to continue to decline to exercise our discretion to consider GMAC's ballot.

■ Nevertheless, we will exercise our discretion to review several of GMAC's Objections to confirmation. Fortuitously for GMAC, one aspect of the Plan renders it unconfirmable.

2. SINCE ALL CLASSES OF CREDITORS VOTED TO ACCEPT THE PLAN, THE DEBTOR HAS MET THE REQUIREMENT OF 11 U.S.C. §§ 1129(a)(8), AND 1129(b) IS NOT APPLICABLE.

GMAC argues that, if a secured creditor does not consent to a plan and is not paid in full, the debtor must satisfy the requirements of 11 U.S.C. § 1129(b), the "cramdown provisions" of the Code, to achieve confirmation. However, § 1129(a)(8) does *not* require that, to attain confirmation, each *creditor* must accept a plan. Rather, it requires only that each *"class* has accepted the plan" (emphasis added). 11 U.S.C. § 1129(a)(8)(A). The class of all secured creditors in which GMAC was placed as a member has accepted the plan, given our independent finding that GMAC's ballot was untimely and therefore cannot be counted. Section 1129(b)·would have been triggered if and only if "the requirements of subsection (a) of [§ 1129] *other than* paragraph (8) are met" (emphasis added). 11 U.S.C. § 1129(b)(1). As to the instant Plan, the requirements of § 1129(a)(8) *have* been met. Therefore, the requirements of § 1129(b) are not applicable.

3. THE DEBTOR HAS COMPLIED WITH 11 U.S.C. § 1129(a)(7)(A), SINCE GMAC HAS NOT ESTABLISHED THAT IT WOULD NOT RECEIVE MORE ON ACCOUNT OF ITS CLAIM IF THE PLAN WERE NOT CONFIRMED THAN IT DOES UNDER THE TERMS OF THE PLAN.

■ 11 U.S.C. § 1129(a)(7)(A) provides that a plan may be confirmed only if,

[w]ith respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

GMAC argues that it received a perfected security interest in the Debtor's Buick open account and Volvo open account, as well as a replacement lien in all of Debtor's assets as granted to GMAC in the cash collateral Order of June 19, 1990. GMAC further asserts that, because of post-petition depletion of the Debtor's assets and because the Plan does not restore GMAC to its pre-petition secured status, GMAC's replacement lien has been activated.

The cash collateral Order does in fact state that the Debtor "has irrevocably acknowledged and agreed that: ... (b) GMAC maintains a valid, perfected, unavoidable lien and security interest in all of the Debtor's inventory, accounts receivable, equipment, contract rights, general intangibles, and all other property described in the Security Documents" (Order of June 19, 1990), ¶ 9, at 4. However, the crucial qualifying language in this clause is that GMAC's security interest extends only to the referenced assets as described in the "Security Documents." No such "Security Documents" were entered into evidence at the confirmation hearing. Without the presence of these documents, we cannot discern whether the collateral securing GMAC's interest is as co-extensive and far-reaching as GMAC purports.

In his testimony, Silverman stated that, to the best of his knowledge, the only remaining assets referenced in the Security Documents which secured GMAC's claim were the Debtor's parts inventory, which he valued at approximately $100,000.00 as

of the date of the confirmation hearing. Silverman stated that, while it was possible that the Volvo and Buick open accounts were pledged to GMAC, he did not recall if the open accounts actually were pledged. However, Claire more positively stated that the Buick and Volvo open accounts had *not* been pledged to GMAC by the Debtor pre-petition.

We recognize that the Silvermans' testimony was countered by that of Burke, who claimed that GMAC did have a security interest in these open accounts. However, although the Debtor has the ultimate burden of proving the presence of all of the elements of § 1129 necessary to sustain an order of confirmation, *see, e.g., In re Gilchrist Co.,* 410 F.Supp. 1070, 1075 (E.D.Pa.1976); and *In re Fricker,* 116 B.R. 431, 437–38 (Bankr.E.D.Pa.1990) (Chapter 13 case); *In re Rusty Jones, Inc.,* 110 B.R. 362, 373 (Bankr.N.D.Ill.1990); and *In re Keaton,* 88 B.R. 154, 156 (Bankr.S.D.Ohio 1988), it was not the Debtor's burden to disprove the extent of GMAC's security interests. Throughout the Code, the burden of proving the "validity, priority, and extent" of security interests lies upon the creditors asserting such interests. *See* 11 U.S.C. §§ 363(*o*)(2), (g); and *In re Grant Broadcasting of Philadelphia, Inc.,* 75 B.R. 819, 822–23 (E.D.Pa.1987). Clearly, the secured creditor is the party having the most access to proof as to the security interest created by documents which it doubtless has drafted, and therefore it logically *should* bear this burden. *See Fricker, supra,* 116 B.R. at 437–38. Moreover, a party's failure to produce documentary evidence in its possession and control which would properly be a part of its case permits an inference to be drawn that the evidence, if produced, would have been unfavorable to that party. *See McElroy v. Cessna Aircraft Co.,* 506 F.Supp. 1211, 1220 (W.D.Pa. 1981); and *Berry v. School District of Benton Harbor,* 442 F.Supp. 1280, 1299 (W.D.Mich.1977). Finally, some courts have held that the objector bears the burden of proving affirmative objections to confirmation. *See Northeast Dairy Cooperative, supra,* 73 B.R. at 248; and *In re Silver Falls Petroleum Corp.,* 55 B.R. 495, 497 (Bankr.S.D.Ohio 1985).

Based upon the foregoing principles, we find that GMAC's failure to produce the Security Documents results in an inference against its claim that their security interests recited therein include the Buick and Volvo open accounts. This inference, plus the Silvermans' testimony, overcomes GMAC's attempt to meet its burden of proving the extent of its security interests in the Debtor's assets through the testimony of Burke. Thus, we conclude that GMAC has failed to prove that its security interest extends beyond the Debtor's parts inventory.

There is no evidence that the Debtor's assets are worth more than the sum of the secured claims against it. Claire expressly stated that they were not. The only offers to purchase the Debtor's assets were in the amounts of $200,000, at a time when the Debtor's parts inventory was valued at $175,000. The balance of $25,000 would be more than consumed by the DOR's $47,735 secured claim. It thus appears that nothing would therefore be left for unsecured claims if the Debtor were liquidated at present. Hence, if liquidation were to occur, GMAC would receive only the collateral which it has proven secures its claim, *i.e.,* the parts inventory, valued without rebuttal at $100,000.00 by Silverman. By way of contrast, pursuant to the terms of the Plan, GMAC would receive the value of the parts inventory *plus* five (5%) percent of the balance of its unsecured proof of claim for a deficiency. Payment to GMAC of the value of the parts inventory plus five (5%) percent of GMAC's deficiency claim is clearly more than the value of the parts inventory alone, which is all that GMAC would receive in a Chapter 7 liquidation. Therefore, the Debtor has established, on this record, that the Plan complies with 11 U.S.C. § 1129(a)(7)(A).

4. THE CLASSIFICATION AND PRIORITY TREATMENT OF THE DEALER TRADE CLAIMS AND THE CLAIMS OF THE BCP AND MERIDIAN ARE NOT VIOLATIVE OF 11 U.S.C. § 1122(b).

GMAC claims that, in two ways, the Plan violates 11 U.S.C. § 1122, which provides as follows:

**1122. Classification of claims or interests**

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such a class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

First, GMAC argues that the Debtor has violated § 1122(b) in its Plan by classifying the unsecured dealer-trade claims and the claims of the BCP and Meridian separately from other unsecured claims as priority claims. Moreover, GMAC contends that the Plan discriminates unfairly in its treatment of such claims by paying these claims in full, while relegating general unsecured claimants to payment of but five (5%) percent of the amount of their allowed claims.

Classification is not really an issue here. The requisite majority of general unsecured creditors that submitted timely ballots voted in favor of the Plan, as did several of the creditors allegedly improperly granted priority status. Hence, there is no issue of "gerrymandering" of impaired classes simply to retain an affirmative vote from at least one impaired class. *Compare In re 222 Liberty Associates*, 108 B.R. 971, 989–90 (Bankr.E.D.Pa.1990) (classification scheme of plan permitted even though gerrymandering may have been a motivating factor in classification).

■ There is, however, a further, more significant, issue arising from the strikingly different treatment of the alleged priority creditors as opposed to general unsecured creditors. As we held in *222 Liberty Associates*, the plan proponent bears the burden of proving " 'a reasonable basis for the degree of discrimination [in treatment of claimants] contemplated by the Plan.' " 108 B.R. at 991, quoting *In re Furlow*, 70 B.R. 973, 978 (Bankr.E.D.Pa.1987).

■ Silverman testified without rebuttal that full payment of dealer-trade claims was absolutely necessary to the future success of the Debtor's business. Not only was it needed to re-establish a good relationship with other dealers whose trades would supply a large percentage of the vehicles sold, but also this treatment was needed because both of the franchisees willing to resume a relationship with the Debtor, *i.e.*, Buick and Volvo, had made full payment of dealer-trade claims a prerequisite of their continuing respective future relationships with the Debtor. Therefore, the Debtor had good reason for allowing the degree of favorable treatment allotted to these parties.

The BCP and Meridian had both filed adversary proceedings seeking to have their claims declared as subject to trust funds which were not property of the estate and must be repaid in full by the Debtor, as trustee of the funds. These contentions were not frivolous. Also, the Debtor's obligations to BCP and Meridian may have been nondischargeable debts under 11 U.S.C. § 523(a)(4). Finally, the nonpayment of these claims had generated tremendous unfavorable publicity for the Debtor. A failure to satisfy them could well have created an insurmountable public relations obstacle for the Debtor in its attempt to re-enter a highly competitive market. We therefore conclude that the Debtor has shown a reasonable basis for the priority treatment accorded to these creditors.

The majority of unsecured creditors who voted on the Plan, with the notable exclusion of GMAC, were apparently not troubled by the allegedly preferential treatment received by the dealers on their trade claims and by the BCP and Meridian on account of their respective claims. We are therefore not prepared to deny confirmation of the Plan on this basis.

5. HOWEVER, THE PRESENCE OF DISSIMILAR CLAIMS AND TREATMENTS OF SECURED CREDITORS IN A SINGLE CLASS PRECLUDES CONFIRMATION.

■ Section 1122(a) of the Code allows a plan proponent to place particular claims

together in a class "only if such claim or interest is substantially similar to the claims and interests of such class." We have interpreted this language to mean that, even in view of Congress's intent to permit flexible claim classification, the Code requires that all claims classified together possess substantial similarity. *222 Liberty Associates, supra,* 108 B.R. at 990. "The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; ..." *In re Jersey City Medical Center,* 817 F.2d 1055, 1060 (3rd Cir.1987).

In light of the terms of § 1122(a), many courts have concluded that secured creditors may not be classified together when they have liens in different property, or possess liens of different priority in the same property, since their respective legal rights are not substantially similar. *Id.; In re Commercial Western Finance Corp.,* 761 F.2d 1329, 1338 (9th Cir.1985); *In re Moore,* 81 B.R. 513, 517 (Bankr.S.D. Iowa 1988); *In re Holthoff,* 58 B.R. 216, 219 (Bankr.E.D.Ark.1985); *In re Butler,* 42 B.R. 777, 782 (Bankr.E.D.Ark.1984); and *In re Sullivan,* 26 B.R. 677, 678 (Bankr.W. D.N.Y.1982). Substantial similarity of claims in a class insures that "classes of claims will have similar interests and that votes cast by the class will reflect joint interests of the class." *Butler,* 42 B.R. at 782. Thus, clearly,

> the primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. Emphasis is not upon the holder so much as it is upon that which is held.

*Northeast Dairy Cooperative,* 73 B.R. at 250.

In the exercise of its independent obligation to determine whether the debtor's plan met the requirements for confirmation, and as an additional basis for denial of confirmation, the bankruptcy court in *Moore, supra,* observed that a single class of secured creditors consisted of claims not substantially similar because "[t]he collateral is varied and distinct as evidenced by the security interests in vehicles, in a phone system, and a share account and the mortgage on the homestead." 81 B.R. at 517 n. 4.

In *Butler,* the bankruptcy court found the secured claims in issue to not be substantially similar because they were collateralized by different property. In fact, the court failed to find similarity among liens held by two creditors which were secured by "separate and distinct items of farm equipment." 42 B.R. at 782.

The bankruptcy court in *Sullivan* held that the § 1122 requirements were not met because the secured claims were not substantially similar. Two of the claims were secured by mortgages on two separate and distinct pieces of real property. The remaining two secured interests found dissimilar were held in a 1976 Oldsmobile and a 1975 Ford truck. *Sullivan,* 26 B.R. at 678.

In the case at bar, the Debtor placed all of the secured creditors together in one class, despite not only the fact that the claims are secured by different property, but also the fact that the Plan contemplates very different treatment for these variant claims.

Although the Debtor maintains that the Plan does not provide for payment of Provident's claim, the Plan states that Provident's "mortgage securing real estate owned by Richard and Claire Silverman will be paid in full." ¶ 2.8, at 5. In his testimony, Silverman stated that the Debtor had pledged this asset in exchange for floorplan financing for the Heritage dealership. Upon satisfaction of the mortgage, he stated that Provident would assign its position to MCA, which is making the loan to the Silvermans the proceeds of which they are utilizing to fund the Plan.

Volvo possesses a secured claim in certain, unspecified wheel-alignment equipment. AT & T has a secured claim in a telephone system utilized by the Debtor. Pitney has a security interest in a postage meter machine. Volvo, AT & T, and Pitney will have their security interests satisfied in full, since the Debtor intends "to cure any and all defaults in its obligations" with these creditors.

Fidelity possesses a security interest in a VIMNET computer system and printer. As part of the Plan, Fidelity is given the right to repossess the computer system and sell it pursuant to applicable state and/or federal law. Any unsatisfied portion of its security interest would be reduced to a deficiency claim and treated as an unsecured claim, i.e., Fidelity would receive five (5%) percent of the allowed unsecured claim on the Effective Date of the Plan.

According to the Plan, and as was incontestably established at the confirmation hearing, see pages 850 and 851 supra, GMAC possesses a secured claim in the Debtor's Buick and Volvo automotive parts. GMAC, as noted at page 850 supra, alleges that, pursuant to the cash collateral Order of June 19, 1990, in this case, the Debtor irrevocably acknowledged GMAC's security interest "in all of the Debtor's inventory, accounts receivable, equipment, contract rights, general intangibles, and all other property ..."[5] Despite this interest, the Debtor proposed to pay GMAC only the value of the automotive parts as of July 7, 1990, i.e., $183,884.90, or, at its own option, the actual value of the automotive parts, following an inventory of the automotive parts conducted by the Debtor. As we indicated at pages 850–851 supra, the Debtor has apparently chosen the latter option and intends to pay GMAC $100,000 on account of its security interest. Like Fidelity, any unsatisfied portion of GMAC's security interest would be considered a deficiency claim and treated as an unsecured claim. Finally, as noted at pages 845–846, 851 supra, the DOR has apparently filed a partially secured claim. All priority, non-penalty claims of the DOR, including apparently the secured portion of same, will be paid in full on the effective date of the Plan.[6]

It is clear that, by authority of the foregoing cases, the security interests of the claimants in the secured class of claims are widely disparate. The secured different property under different terms.

However, even more significant is the fact that these various secured claimants are treated very differently. Thus, 11 U.S.C. § 1123(a)(4), which requires "the same treatment for each claim or interest of a particular class," is violated by the Plan. See Jersey City Medical Center, supra, 817 F.2d at 1061; and In re Acequia, Inc., 787 F.2d 1352, 1362 (9th Cir. 1986). Provident, which is not even listed as a secured claimant, will have its claim satisfied in full, as will Volvo, AT & T, and Pitney. Fidelity may satisfy its interest by repossession and supplementing such repossession by the filing of a proof of claim for any deficiency claim. Finally, GMAC is left with partial satisfaction of its security interest. And, like Fidelity, GMAC can only hope to receive five (5%) percent of its deficiency claim.

The inequity of such classification is borne out by the results and consequences of the voting on the instant Plan. One member of the secured class of creditors, AT & T, voted to accept the Plan, and none voted against it, except for GMAC's belated ballot. This vote of one well-treated creditor should not be allowed to constitute acceptance by a class which includes parties treated significantly less favorably.

We find that this deficiency of the Plan is of such significant magnitude that we must deny confirmation because of it, even in the absence of timely Objections to the Plan on this basis. We believe that it would constitute an abuse of our duty of oversight to allow confirmation of such a plan, and we will therefore exercise our discretion to deny confirmation on this basis.

## D. CONCLUSION

As a result of the presence of this one fatal deficiency, we are obliged to deny

---

**5.** The accuracy of this allegation was discussed at pages 850–851 supra.

**6.** However, the Objection of the DOR to confirmation, in addition to being untimely, even relative to GMAC's filing objecting to the Plan, is substantively unclear. The Plan provides that all of the DOR's priority claims will be paid in full on the effective date. It therefore is clearly irrelevant whether such claims be specified as pre-petition or post-petition, secured or unsecured.

confirmation of the Plan, irrespective of the absence of timely Objections thereto. Nevertheless, we recognize that we have ruled that numerous untimely Objections to the Plan do not have substantive merit. Therefore, the Debtor's Plan, even as written, has cleared numerous hurdles, and it appears to us that there is clearly a potential that the Debtor may be able to amend its present Plan and yet obtain confirmation. The Plan in issue was only the second plan proposed by the Debtor. No other party has proposed a plan. *Compare 222 Liberty Associates, supra,* 108 B.R. at 997-98 (debtor precluded from filing an *eighth* plan pending confirmation proceedings on the secured creditor's *competing* plan).

However, we do observe that the Debtor missed a golden opportunity. GMAC is most unlikely to fail to vote upon, as well as object to, any future plans of the Debtor with which it fails to find favor. Unless an accommodation is reached with GMAC, it is unlikely that the Debtor will be able to propose another plan and avoid confrontation with the cram-down requirements of § 1129(b). However, the Debtor avoided this confrontation only by the promulgation of a classification scheme which we found to be improper.

We cannot believe that the Debtor intentionally planned this scenario. It could have never predicted GMAC's failure to vote or object in timely fashion. Therefore, we cannot find that the Debtor failed to act in good faith in this matter. Furthermore, we sense that the Debtor may have been close to reaching a global accommodation with GMAC, and that GMAC's failure to vote or object to the Plan earlier than March 17, 1991, may have been a function of an assumption on the part of GMAC that such a settlement would be or had been reached.

In any event, we will allow the Debtor a further opportunity to file a Second Plan of Reorganization and any accompanying Amended Disclosure Statement, as long as this is accomplished by June 3, 1991. We will also tentatively set July 3, 1991, as the date for a hearing on the further Amended Disclosure Statement, for calendaring purposes. Obviously, the Debtor is authorized to file and serve amended submissions sooner, and thereby expedite the confirmation process.

An Order consistent with the conclusions reached in this Opinion will be entered.