**In re CENTER COURT APARTMENTS, Inc.**

**No. 19640.**

District Court, W. D. Pennsylvania.

July 2, 1937.

Arthur D. Gatz, Aaron M. Jaffe, and B. L. Steinberg, all of Pittsburgh, Pa., for William Eger and Elmer Breyer, intervening bondholders.

W. W. Stoner and Thos. N. Griggs, both of Pittsburgh, Pa., for debtor.

Maurice Chaitkin, of Pittsburgh, Pa., managing agent and attorney for the debtor.

Harold L. Rothman, of Pittsburgh, Pa., for Investors Management Corporation.

Arthur Douglas and Root, Clarke, Buckner & Ballantine, all of New York City, for Real Estate Bondholders Protective Committee.

Wise, Shepard, Houghton & Hoffmann, of New York City, for Continental Bank & Trust Co., of New York, successor trustee.

**GIBSON, District Judge.**

On July 14, 1936, the debtor filed a petition under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. After approval of the petition, the debtor was allowed to remain in charge of its principal asset, an apartment house in Pittsburgh. On August 19, 1936, a joint plan of reorganization was filed by the debtor and the Real Estate Bondholders Protective Committee. This committee was organized in New York in 1932 for the protection of bondholders covering real estate issues underwritten by S. W. Strauss & Company.

Under the plan before the court the first mortgage bondholders are to receive for each $100 of principal of their bonds $100 in principal amount of new bonds and $3 in cash. The amount of cash is to be paid from the accumulated, earnings of the property now in the hands of the trustee under the mortgage. The new bonds are to bear interest at the rate of 3% so long as the outstanding bonds exceed $150,000, at the rate of 3½% until the outstanding issue is $100,000, and at the rate of 4% thereafter. No provision is made for the payment of back interest upon the old first mortgage bonds, upon which the interest rate was 6%.

The holders of the present second mortgage bonds, by the plan, are to receive in lieu of their holdings, 200 shares of preferred stock of the new company having a par value of $100. This stock is to bear non-cumulative dividends, payable annually at the rate of 2% out of net earnings; but no dividends are to be paid until all the new bonds are retired. The second mortgage bonds amount to $20,000.

Unsecured creditors have claims which amount to about $20,000, and they are to receive 100 shares of the new preferred stock and 200 shares of the new common stock having a par value of $50.

The present stockholders have 1360 shares of common stock, and the plan gives them a like number of shares in the new company. No provision for new money appears in the plan. So long as 50% of the new bond issue is outstanding, the stock going to present stockholders is to be deposited with the trustee under the mortgage to secure the obligations of the debtor, and in event of default the trustee acquires title to it. Upon retirement of 50% of the issue, the stock is to be delivered to the stockholders.

The plan further provides that earnings in excess of taxes, expenses and interest on the mortgage shall be paid to the trustee, who shall use the fund to purchase mortgage bonds for cancellation at the lowest price obtainable, but not in excess of par value.

Before the fairness and feasibility of the plan may be considered, several issues collateral thereto must be decided. The first is the value of the debtor's property. Three appraisers were appointed by the court, none of whom was named at the suggestion of any party in interest. After they had returned a valuation of $194,600 upon the land, building and furnishings, and exceptions were filed to their report, several of the appraisers and others were called as witnesses as to value. The testimony fairly establishes as correct the value returned by the appraisers. In addition to the real estate, cash in the possession of the trustee amounted to about $22,300. Accepting the total value of the assets of the debtor as about $216,900, as the court does, it is plain that the debtor is insolvent—and insolvent to the extent that its assets are insufficient to meet its indebtedness upon its first mortgage bonds. The total first mortgage bond issue amounted to $203,500. Interest thereon was due from July 15, 1933, to May 6, 1937, in amount $46,600.74. In addition to the first mortgage indebtedness was a second mortgage indebtedness on May 6, 1937, with interest, of $24,600; and unsecured indebtedness and taxes amounted to an additional $25,000.

This condition of insolvency will later be considered.

Another issue which has arisen in the proceeding is based upon the contention of certain interveners that the plan has

not been approved by a sufficient proportion of the only creditors in interest, the first mortgage bondholders.

█ Under the statute two-thirds of the first mortgage bond issue, $135,666.67, was required to assent to the plan before the approval of the court could be given to it. Holders of bonds aggregating in amount $29,900 were deposited with the Clerk of the Court and voted in favor of the plan. Concerning these bonds no question has arisen. The Real Estate Bondholders Committee voted $119,600 of bonds deposited with it, and certain of these bonds, interveners allege, were improperly cast in favor of the plan, and were needed to make up the percentage required by section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

All of the bonds voted by the Bondholders Committee were held by it under a deposit agreement. Messrs. Falk and Frank had certificates of deposit from the Committee for first mortgage bonds aggregating $13,600, and, upon submission of the plan to the certificate holders by the Committee, had filed their dissent thereto. Subsequently the Falk and Frank certificates were transferred to Elmer Breyer, one of the interveners, who notified the Committee of his desire to withdraw the bonds. Notified that he could do so, if he paid $680 in twenty days, he obtained a certified check for that amount, but failed to deliver it within the period fixed by reason of absence of the agent of the Committee. Upon tender after the twenty-day period, the delivery of the bonds was refused. After the refusal the bonds were voted in favor of the plan.

Frank G. Freyvogel held certificates of deposit for bonds aggregating $6,100. He, in the vote inside the Committee, dissented to the plan, but did not withdraw his bonds. Not having done so, his petition to intervene in this proceeding in opposition to the plan was denied. His bonds were voted in favor of the plan by the Committee.

The Investors' Management Corporation, which represented bonds and certificates of deposit of the Committee in amount of $27,000, intervened in opposition to the plan. It does not appear in the record what bonds were deposited with the Committee and voted.

E. J. Kreuger, holder of $2,000 of first mortgage bonds, also dissented to the plan. His bonds were deposited with the Committee and voted in favor of the plan.

To summarize, bondholders directly voted bonds of the face value of $29,900, and the Real Estate Bondholders Protective Committee voted bonds held by it, in amount of $119,600, making a total in apparent favor of the plan of $149,500, or an excess of $13,833.33 above the two-thirds of the total issue. This excess was more apparent than real. Elmer Breyer had expressed his intention to withdraw his bonds from the Committee and stood ready to pay the amount which had been fixed by the Committee as his pro rata share due under the deposit agreement. Of this readiness and the ability of Breyer to pay the amount claimed the Committee had notice prior to the expiration of the period fixed by the agreement, and the payment was not made and the withdrawal consummated within the period only because of the absence of the Committee's agent from the place where his bonds were deposited. In refusing to deliver the Breyer bonds upon tender of payment after the twenty-day period, the agent of the Committee was attempting to take an undue technical advantage which cannot be allowed. In its consideration of the votes cast in favor of the plan, the court does not include among those in favor of the plan the bonds of Elmer Breyer cast by the Committee in favor of the plan. The situation presented brings the matter within the exceptions of the majority opinion in Re Witherbee Court Corporation, 2 Cir., 88 F.2d 251, 256.

█ Deducting the Breyer bonds from those voted for the plan, an excess of $233.33 over the required quota still is shown. True, it appears in the record that Frank G. Freyvogel and E. J. Kreuger, owners of bonds, respectively, in amounts of $6,100 and $2,000, have opposed the plan; and also the Investors Management Corporation, which holds certain certificates of deposit which were voted for the plan. None of these bonds were withdrawn by the owners, nor was any reason or excuse given for the failure to withdraw, so as to bring them within the exceptions mentioned in the Witherbee Court Corporation Case, supra. Under these circumstances the court would not be justified in taking away from the Committee the right to vote the bonds which was expressly given it by the deposit agreement. The court therefore finds

that the plan was approved by holders of two-thirds of the first mortgage bonds, and by subsequent bondholders, unsecured creditors and stockholders.

■ Having reached such a conclusion, albeit by a narrow margin, the court is required to consider the fairness and feasibility of the plan.

By the debtor's petition for reorganization it appears that its first mortgage was in default, and that the Continental Bank and Trust Company, as Trustee under the mortgage, had taken possession of the Center Court Apartments on July 1, 1933, and has been operating it from that date. In so doing it has employed an officer of the debtor as its manager. All net earnings have been forwarded and are in the present possession of the Trustee. The reorganization plan proposes to transfer possession of the property from the trustee for bondholders to the debtor; to substitute for the present mortgage (now in default and securing bonds bearing interest at the rate of 6%, and upon which more than $46,600 of interest is due) a mortgage securing a bond issue of the same size as that in default payable in twelve years, bearing interest at the rate of 3% to 4%, and releasing the debtor from liability for the interest due on the present bond issue; and to give to second mortgage holders preferred stock of the face value of their present bonds, now in default; to give to unsecured creditors 225 shares of preferred stock and 225 shares of common; and to give to the debtor's present stockholders 2250 shares of common stock. Nothing is to be paid stockholders until the new bond issue is retired.

It thus appears that the first mortgage bondholders are called upon to postpone recovery of their principal for twelve years and their past due interest forever. And during the period prior to the maturity of the new bonds, they are to receive interest at a much reduced rate. What are they to get in return for the rights relinquished? Certainly nothing very tangible. The only suggestion of advantage is that the apartment will be well managed; but no assurance appears in the plan that its present manager will continue in event the plan is adopted, nor

does it appear that he will not act if the present status is maintained. Assuming his loss, no known shortage of competent apartment house managers is generally recognized. As against this alleged advantage provided by the plan is a much more apparent detriment. Few buildings become practically obsolete so quickly as apartment houses. Let a new one be built, and the occupants of the old flock to it. The present building, well maintained as it has been, is by no means new and will require increasing expenditures in repair during the next twelve years. This being so, grave doubts exist as to the feasibility of the plan; but the controlling reason of the court for denial of approval of the plan is the opinion that it is not fair and equitable to the minority bondholders, who, against their will, are compelled to accept a more unfavorable position than they have at present. What they give to junior creditors and stockholders is more or less nebulous and visionary perhaps, but whatever it be, it is something they are not entitled to have at the expense of unwilling senior creditors.

Certain of the interveners in the instant matter have urged liquidation, and during the pendency of the proceedings, have offered to bind themselves to bid a minimum of $150,000 for the property upon sale. This would allow the bondholders about 80% of the face of their claims. This offer, when submitted to bondholders by the Committee, received responses from the holders of bonds in amount of $158,500, of which holders of $85,900 bonds favored the sale, and holders of $72,600 opposed it. As the proposed purchasers' bonds, amounting to $55,500, were voted for the sale, the Committee disregarded them and rejected the offer. We do not mean to suggest that this proposition be accepted in event of renewal of the offer, but mention it simply as a reason why the court does not at this time order liquidation. It furnishes ground for hope that some plan may be offered which will be satisfactory to all parties in real interest. The court therefore will extend the period for filing plans of reorganization to October 1, 1937. If no plan be submitted before or on that date, such action will be taken as seems proper.