**In re INGLESIDE ASSOCIATES, A General Partnership, Debtor.**

**Bankruptcy No. 91–13524S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 20, 1992.

957

Charles M. Golden, Obermayer, Reb-
mann, Maxwell & Hippel, Philadelphia, Pa.,
for debtor.

Robert Szwajkos, Lavin Coleman Finarel-
li & Gray, Philadelphia, Pa., for Charles
Pasquale.

Frederic Baker, Philadelphia, Pa., Ass't.
U.S. Trustee.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

A.  INTRODUCTION

■ Before this court are numerous Ob-
jections of Charles P. Pasquale ("Charles"),
the owner of a 23% "voting interest" of the
partnership interests of the Debtor-realty
partnership, to confirmation of the Debt-
or's Chapter 11 Plan of Reorganization
("the Plan"), which was conceived by
Charles' brother, H. Donald Pasquale

("Donald"), who also owns a 23% "voting
interest" in the Debtor.  We hold that one
of the Objections, alleging the failure of
the Plan to conform to 11 U.S.C.
§ 1129(a)(10), must be sustained, because
the only classes impaired by the Plan in-
clude (1) "intercompany loans" from close-
ly-related partnerships, and (2) "general
partnership interests," both of which
classes contain only insiders.

However, since it appears that minor re-
visions to the Plan could overcome this
defect and that some degree of future
guidance to the Debtor regarding the per-
ceived merit of other issues raised by
Charles is appropriate, we briefly discuss
and reject the other Objections of Charles,
most notably a contention that his partner-
ship interests cannot be altered by the
Plan.

B.  PROCEDURAL AND FACTUAL HIS-
TORY

The sum of the "voting interests" in the
Debtor are allocated as follows: 23% each
to Donald and Charles; 6% to Thomas N.
Shine ("Shine"), the Debtor's chief financial
officer, who generally supports Donald in
the brothers' disputes; and 46% to Domin-
ick Pasquale, the father of Donald and
Charles ("the Father").  Other partner-
ships controlled by the Pasquale brothers
are owned, by them and/or Shine, in equal
shares.  Pertinent to this dispute is the
fact that, as to two of the other partner-
ships, Forge Industrial Tract ("FIT") is
owned 46% each by Donald and Charles
and 8% by Shine, and Pasquale Partnership
("PP") is owned 50% by Donald and
Charles.

On April 3, 1991, INGLESIDE ASSOCI-
ATES ("the Debtor"); several other realty
partnerships controlled by the Pasquale
brothers, including ·FIT and PP; and
SWEDELAND ROAD CORPORATION
("Swedeland"), a Subchapter "S" corpora-
tion controlled by them, all filed voluntary
Chapter 11 bankruptcy cases.  Plans of
Reorganization and accompanying Disclo-
sure Statements were filed for each of the
Pasquale debtor entities, including this
Debtor, FIT, and PP, on November 1, 1991.

At hearings on the respective Disclosure Statements on November 27, 1991, the debtors in FIT, PP, and all of the other Pasquale cases except the instant Debtor indicated a desire to file what they hoped would be consensual Amended Plans, accompanied by Amended Disclosure Statements, by January 7, 1992, with hearings to be conducted on the Amended Disclosure Statements on February 5, 1992. After hearings on February 5, 1992, we allowed the debtors in all of the Pasquale cases except this one to file further Amended Disclosure Statements by February 18, 1992, with any further Objections due February 25, 1992. These cases thus appear to be on a track for prompt potential consensual plan confirmations.

The Disclosure Statement accompanying the Debtor's Plan was approved on November 27, 1991, and the voting materials accompanying it were to be transmitted by December 6, 1991. Ballots and Objections to confirmation were to be filed by January 3, 1992. A Report of Plan Voting ("the Report") was to be filed by January 9, 1992. The confirmation hearing was scheduled on January 15, 1992.

The instant Plan was pursued prior to those in the other cases because it was perceived as less likely to be subject to objection by creditor interests. In fact, the Plan and Disclosure Statement assert that no classes of claims are impaired. Notable are the following descriptions of treatment of the secured claim of Royal Bank of Pennsylvania ("Royal") (Class C); general unsecured claims (Class D); post-confirmation "intercompany loans" from PP (Class F); unsecured pre-petition "intercompany loans" (Class G); and "general partnership interests" (Class H), in the Plan, as finally amended:

*Class C Claim of Royal.* This claim is unimpaired. This class consists of the claim of Royal which holds a first mortgage on Buchanan House which mortgage secures pre-petition principal

amount of $500,000, and a second mortgage on Ingleside Golf course which secures a debt in the amount of $5,500,000 as of the petition date. Debtor shall cure any default and continue its obligations under the existing mortgage documents.

.    .    .    .    .

*Class E General Unsecured Claims.* Class E Claims are unimpaired. Each holder of an Allowed Claim in Class E shall receive payment in two installments at any time up to one year after the Confirmation Date, but in no event later than the Effective Date.[1]

*Class F Post–Confirmation Intercompany Loans from Pasquale Partnership.* Class F Interests are unimpaired. The Class F Interests will be paid off after the elements to the above plan but before the partnership interests and no later than three (3) years.

*Class G Unsecured Intercompany Loans.* Class G interests are unimpaired. The Class G interests will be paid off in cash or property, when debtor elects, a period not to exceed ten years.

*Class H General Partnership Interests.* Class H interests are unimpaired. To insure compliance with the absolute priority obligations imposed by the Code, the holders of Class H Partnership Interests will retain such interest only if each creditor senior to it receives a 100% of their Allowed Claim, or its "new value" in the form of contributions of capital are made. To the extent any partner fails to add 100% of that partner's pro-rata share of "new value" contribution to the Debtor's estate, as called for by any partner and deemed necessary or appropriate in the business judgment of the partnership as determined by at least a majority of the partnership interest for the day to day operations, or future development of the Debtor, that partner's partnership interest shall be deemed to be zero and, all indicia of ownership cancelled. In order

---

1. This provision was modified in the final version of the Plan. Previously, it had read as follows:

> *Class E General Unsecured Claims.* Class E Claims are unimpaired. Each holder of an Allowed Claim in Class E shall receive payment in two installments up to one year after the Effective Date.

to ensure that the plan will be implemented according to its stated terms, Debtor will request that the court, in its confirmation Order, provide that any partner is authorized to execute any document, including but not limited to notes, security agreements, leases, deeds and legal pleadings, on behalf of the partnership which are necessary for implementation of the plan.[2]

During the voting period, the apparently long-volatile relationship of Donald and Charles burst into litigation. On December 27, 1991, FIT, per Donald, filed two adversary proceedings against Charles, seeking to compel him to execute security documents necessary to effectuate the terms of two previously court-approved transactions: (1) An extension of a loan from Continental Bank; and (2) A loan to fit out one of FIT's buildings for a new tenant. After preliminary injunction hearings on both matters on January 7, 1992, the parties requested an opportunity to attempt to resolve their differences in those proceedings, submitting Briefs by January 30, 1992, and carrying the matters over to February 5, 1992, only in the event that they did not resolve them.

Charles filed Objections to confirmation of the Debtor's Plan on January 6, 1992. The Report, as amplified by the subsequently-ordered filing of the ballots themselves, indicated the following votes:

1. Acceptances by all three unsecured creditors which voted;

2. A ballot on behalf of PP signed by Charles, rejecting the Plan;

3. A ballot on behalf of FIT and PP, signed by Donald and Shine, accepting the Plan;

4. A ballot from Charles, as an individual partner of the Debtor, rejecting the Plan;

5. Ballots from Donald, Shine, and the Father, as individual partners, accepting the Plan. However, the Father's ballot is signed by Donald as the Father's "atty. in fact." Attached to a subsequently-filed compilation of the ballots is a Power of Attorney, executed by the Father and Frances M. Pasquale, the wife of the Father and presumably the mother of Donald and Charles, which appoints Donald as

> our true and lawful attorney[3] for us and in our names and on our behalf generally to do and perform all matters and things, transact all business, make, execute and acknowledge all contracts, orders, writings, assurances and instruments which may be requisite or proper to effectuate any matter or thing appertaining or belonging to us, with the same powers, and to all intents and purposes with the same validity as we could, if personally present; hereby ratifying and confirming whatsoever my said attorney shall and may do by virtue hereof....

The confirmation hearing was, like the FIT adversary trials, put off until February 5, 1992, in the hopes that the brothers could internally resolve their differences. They apparently could not. At the outset of the proceedings, we announced our intention to enter an Order allowing Donald and Shine to execute the security documents in dispute in the FIT adversary proceedings on behalf of Charles. We then proceeded with the confirmation hearing.

Shine, Donald, and George Falconiero ("Falconiero"), an accountant who serves both brothers and their various business entities and somehow has retained their mutual trust, testified. Shine described the Debtor's operations, principally the operation of a public golf course and a restaurant housed in a former summer home of James Buchanan, as profitable. He also portrayed Charles as an idle obstructionist who is accustomed to being stubborn until financial concessions are offered to him.

Falconiero discussed mainly the intercompany transfers. On its books, the Debtor owes $1 million to other Pasquale companies, particularly FIT and PP. However, Falconiero described these "debts" as

---

**2.** This last sentence was added by its inclusion in a letter of December 6, 1991, accompanying transmittal of the plan voting package.

**3.** Donald is, perhaps incidentally, an attorney-at-law.

merely paper entries designed to ultimately upstream equity to Swedeland.

Donald principally testified about the changes which the Plan would effect to the Debtor's Partnership Agreement of January 2, 1979 ("the PA"). The PA provides that

> [t]he management of the partnership business shall be under the direction and control of all Partners and each shall vave [sic] a voice weighted as above noted, and all partners, except Dominick D. Pasquale (Life Estate Partner) shall equally share all obligations in all matters relating to the business.

Donald claimed that the Plan provisions were intended to clarify the parties' otherwise somewhat vague rights in the event Charles continued to refuse to cooperate with the decisions of the majority (him and Shine). He also stated that Charles' expressed fears of a precipitous capital call directed to wipe out his interests were unfounded, as no capital call was foreseen.

The parties were directed to simultaneously submit Briefs on the issue of confirmability of the Plan on February 14, 1992. The timing of these submissions on Valentine's Day did not prove to assist the brothers in resolving the disputes between them.

## C. CONCLUSIONS OF LAW/DISCUSSION

### 1. SINCE THE ONLY ACCEPTANCES OF THE PLAN ARE BY EITHER CLASSES WHICH ARE UNIMPAIRED OR BY CLAIMANTS WHICH ARE INSIDERS, THE PLAN VIOLATES 11 U.S.C. § 1129(a)(10) AND CANNOT BE CONFIRMED.

Charles raises numerous Objections to confirmation, some more vigorously than others. We conclude that one of his more technical and less vigorously-argued Objections must be sustained. We will therefore discuss this Objection, based upon 11 U.S.C. § 1129(a)(10), at some length. Since this defect appears curable, we will then briefly discuss, and indicate our skepticism as to the merits of, the other Objections

asserted by Charles. Our hope is that, prior to consideration of confirmation of an Amended Plan, the brothers will resolve their differences and avoid the necessity of our appointment of a trustee in all or most of their entities' cases. *See In re Advanced Electronics, Inc.,* 99 B.R. 249 (Bankr.M.D.Pa.1989) (deadlock in Board of Directors is itself a sufficient cause to justify appointment of a trustee).

11 U.S.C. § 1129(a)(10) provides as follows:

> **§ 1129. Confirmation of plan**
>
> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> . . . . .
>
> (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

We discussed the concept of "impairment" of claims, as defined in 11 U.S.C. § 1124, at length in *In re Temple Zion,* 125 B.R. 910, 917–20 (Bankr.E.D.Pa.1991). There, we held that "impairment" is a term of art and is an extremely broad concept, extending beyond a worsening of a creditor's or interest holder's position to include virtually any alteration of the rights of interested parties beyond those specifically designated as not effecting "impairment" in 11 U.S.C. § 1124(2).

■ Applying this test, we nevertheless agree that there is no impairment of the class of unsecured claims (Class E). Therefore, the affirmative votes of members of this class, though cast by non-insiders, are excluded from consideration under § 1129(a)(10).

■ The only other classes of claims whose votes we need consider, under § 1129(a)(10), because they are the only classes of claims which garnered any votes, are Classes F, G, and H. The members of Class H are all general partners in or of, and/or relatives of general partners in or of, and/or persons in control of, the Debt-

or. Therefore, the votes of all members of this Class are votes of insiders. *See* 11 U.S.C. §§ 101(31)(C)(i), (ii), (iv), (v). Under § 1129(a)(10), these votes cannot be considered.

■ The only issue presenting any difficulty is whether FIT and PP are "insiders" of the Debtor, whose votes, on behalf of Classes F and G, must also be discounted. They are not within any of the enumerated categories of insiders of partnerships set forth, in 11 U.S.C. § 101(31)(C), as follows:

> Insider *includes*—
>
> (C) if the debtor is a partnership—
>
> (i) general partner in the debtor;
>
> (ii) relative of a general partner in, general partner of, or person in control of the debtor;
>
> (iii) partnership in which the debtor is a general partner;
>
> (iv) general partner of the debtor; or
>
> (v) person in control of the debtor.

Although, as "sister-partnerships" to the Debtor, owned by the same parties, FIT and PP might appear to meet the definition "affiliates" of the Debtor, *see* 11 U.S.C. § 101(31)(E), in fact they do not. All of the categories of "affiliates," as defined by 11 U.S.C. §§ 101(2)(A), (C), (D), are plainly inapplicable. The language of 11 U.S.C. § 101(2)(B), which would appear to draw in sister entities, applies only to corporations. Therefore, FIT and PP are not within the scope of "insiders" expressly identified in 11 U.S.C. § 101(31).

■ However, this is the beginning rather than the end of our inquiry as to their insider-status. It is well-established that

> the term "insider" should be applied flexibly to include a broad range of parties who have a close relationship with the Debtor. *See, e.g., In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 209–11 (5th Cir.1983); and *In re Acme–Dunham, Inc.,* 50 B.R. 734, 739 (D.Me.1985).

*In re Orsa Associates, Inc.,* 99 B.R. 609, 621 (Bankr.E.D.Pa.1989). Since § 101(31) states merely that entities designated therein are *included* within its scope, it is apparent that relationships not specifically referenced therein may nevertheless establish "insider" status.

"Insider" status must be determined upon an analysis of "the closeness of the parties and the relative degree of control each has over the other." *In re Gilbert,* 104 B.R. 206, 210 (Bankr.W.D.Mo.1989). Thus, the court, in *In re Heights Ban Corp.,* 89 B.R. 795, 799 (Bankr.S.D.Iowa 1988), notes that

> [t]he legislative history of section 101(30) [now (31)] (B) states that "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor". S.Rep. No. 95–989, 95th Cong., 1st Sess., 25, *reprinted in* 1978 U.S.CODE CONG. & ADM.NEWS 5787, 5810. Persons not specifically defined but of similar type also can be "insiders". *In re Blesi,* 43 B.R. 45, 48 (Bankr. D.Minn.1984); *see also, Matter of Montanino,* 15 B.R. 307, 310 (Bankr.D.N.J. 1981) ("use of the word 'includes' in the definition of an insider is not a limiting term …").

*Accord, In re F & S Central Mfg. Corp.,* 53 B.R. 842, 848 (Bankr.E.D.N.Y.1985); and *In re Featherworks Corp.,* 25 B.R. 634, 639–40 (Bankr.E.D.N.Y.1982), *aff'd,* 36 B.R. 460 (E.D.N.Y.1984).

■ The closeness of the relationship between FIT and PP on one hand and the Debtor on the other is impossible to ignore. The fact that the Pasquale brothers and Shine physically cast the ballots for all three of these entities is indicative of the control that individuals who are insiders of the Debtor have over FIT and PP. While FIT and PP do not control the Debtor, the parties who control FIT and PP are the same parties who control the Debtor. We also note the testimony of Falconiero that the intercompany debts are Pasquale-created book entries which have virtually no real substance. In our view, this element of complete common control between them renders FIT and PP "insiders" of the Debtor.

Therefore, by reason of § 1129(a)(10), we are compelled to discount the Class F and

G votes of FIT and PP as well as those of Class H. Since there are then no votes of classes of impaired non-insiders, confirmation of the Plan cannot be achieved.[4]

■ It appears that this defect of the Plan can be cured. In fact, it *could* have been overcome by leaving the definition of Class E as it originally was drafted. *See* page 958 *supra* & n. 1. In that case, the Class E claims would have been impaired, and the votes of the three non-insider unsecured creditors would have satisfied § 1129(a)(10). Also, we question whether Royal's Class C claims are not impaired and whether, had Royal voted (which it did not), its vote would have been sufficient to overcome § 1129(a)(10).

In any event, the prospect of confirmation of a very similar plan makes it worthwhile to allow the Debtor another opportunity to prepare a confirmable plan and to address and dispose of Charles's other Objections.

### 2. MODIFICATION OF THE PA, AS PROPOSED IN THE PLAN, IS NOT PROHIBITED.

Charles devotes much of his attention to a contention, presumably based upon 11 U.S.C. §§ 1129(a)(1) and (a)(3), that the Plan impermissibly alters the PA by allowing the interest of any partner to be eliminated if that partner fails to contribute to a capital call and, per the December 6, 1991, amendment, allowing authorized partners to execute documents on behalf of the partnerships. This Objection is based upon strongly-worded passages in *In re Sovereign Group, 1984–21, Ltd.*, 88 B.R. 325, 329 (Bankr.D.Colo.1988), regarding the sanctity of partnership agreements under state law in the face of bankruptcy plans which purport to modify these interests.

The short answer to this argument is that the *Sovereign Group* passages were at best dictum which no other court has adopted. The *Sovereign Group* court proceeded to confirm a plan which *did* alter the pertinent partnership relationship, upon

the court's finding that the plan provisions in issue did not effect modifications inconsistent with the partnership agreement as a whole and were permissible under state law. *Id.* at 331–32.

Other courts, particularly at the appellate level, have not echoed the language of *Sovereign Group* regarding the sanctity of partnership agreements and have confirmed plans which did amend partnership agreements. *See In re Block Shim Dev. Co.—Irving*, 939 F.2d 289, 292 (5th Cir. 1991); *In re Acequia, Inc.*, 787 F.2d 1352, 1360–61 (9th Cir.1986); and *In re Map 1978 Drilling Partnership*, 95 B.R. 432, 435 (Bankr.N.D.Tex.1989).

■ In this era of abounding bankruptcies of partnerships formed to purchase and manage real estate, we can perceive of no basis for the overriding concern for the sanctity of partnership agreements communicated in *Sovereign Group*. Bankruptcy plans often amend and modify pre-confirmation contractual relationships that previously existed under state law. If a plan is otherwise confirmable, the fact that it alters a contractual partnership agreement, even in ways not permissible under state law, should not, in itself, prevent confirmation of a plan in all cases.

■ Of course, amendments and modifications to partnership agreements, as those to any other contract, may be so substantial as to justify denial of confirmation under 11 U.S.C. § 1129(a)(1) or (a)(3). However, the modifications submitted here are not so substantial or unfair as to justify such consequences. Requiring partners to contribute according to their interests in order to retain partnership interests is a relatively common feature of many real estate partnership plans. Moreover, in many of these cases, a capital call is an aspect of the plan. Here, Donald credibly testified that no capital case was imminent. Allowing partners authorized to sign documents for a partnership to execute such documents without unanimous approval of

---

**4.** We note that the Debtor's efforts to confirm a plan which impaired only insiders' claims were an attempt to achieve the impossible. In such a

plan, either the votes will be cast by unimpaired classes or by insiders, and hence will never be able to be counted under § 1129(a)(10).

other partners is a right perhaps already inherent in the PA as it exists. In no sense are such provisions onerous or unfair. Rather, given Charles's demonstrated unprincipled stubbornness in the FIT adversary proceedings, such provisions can be classified as mere clarifications necessary to allow the Debtor to function.

Therefore, we would be inclined to totally reject Charles's Objections based upon the Debtor's proposed modifications of the PA as not well-taken.

### 3. DONALD MAY VOTE ON BEHALF OF FIT AND THE FATHER.

Charles challenges the votes cast by Donald and Shine on behalf of FIT and by Donald on behalf of the Father for several reasons, most notably his contention that the requirements of confirmation set forth in 11 U.S.C. §§ 1129(a)(7)A(i) and (a)(8) are not satisfied.

The Code, at 11 U.S.C. § 1126, and the Federal Rules of Bankruptcy Procedure ("F.R.B.P."), at F.R.B.P. 3018, establish general requirements aimed at establishing the legitimacy of the plan voting process, which bankruptcy courts are presumably empowered to enforce. However, the directives included in 11 U.S.C. § 1126 and F.R.B.P. 3018 are not very specific. The sparse authority under the Code and its predecessors suggests that a bankruptcy court should normally accept proffered authority of a voter's right to act for a voting party. *See In re Clark & Willow Sts. Corp.*, 21 F.Supp. 43, 45 (E.D.N.Y.1937). *See also In re Pilsener Brewing Co.*, 79 F.2d 63, 67 (9th Cir.1935); and *In re Center Court Apartments, Inc.*, 23 F.Supp. 407, 409 (W.D.Pa.1937). *But see In re Southland Corp.*, 124 B.R. 211, 220–27 (Bankr.N.D.Tex.1991).

■ Charles appears to be arguing that the ballot cast by Donald and Shine on behalf of FIT cannot be accepted because FIT's own plan has not been confirmed and FIT's creditors may well object to the cancellation of the Debtor's substantial indebtedness, at least on paper, to FIT. However, the matter at issue is a business decision and judgment of FIT, which lies in the hands of FIT's management as long as it remains a debtor-in-possession. We do not consider it appropriate for this court to look behind the vote of FIT without evidence of any irregularity, such as evidence of the lack of authority of Donald and Shine to cast a vote on behalf of FIT. We do not believe that we should insist on a referendum of FIT's creditors or confirmation of FIT's plan as conditions to allowing FIT to cast a ballot in the Debtor's case. We therefore must assume that Donald and Shine have, together, authority to act for FIT unless evidence to the contrary is produced. None was produced here.

■ The parties seem to agree that the contrary votes of Donald and Charles on behalf of PP cancel each other out. We have located no precedents on how to treat such conflicting votes and therefore are inclined to accept cancellation as the proper consequence of such votes.

■ Charles also challenges Donald's vote on behalf of the Father, apparently because the Power of Attorney makes no specific mention of the rights of Donald to act for the Father in matters involving the Debtor. However, the Power of Attorney granted extremely broad rights to Donald. Although powers of attorney are generally construed strictly,

> [s]trict construction of powers of attorney does not militate against the existence of broad discretionary powers. Powers expressly granted will not be restricted by implication nor will a construction be made which will effectively defeat the very purpose of the agency.

*Nuzum v. Spriggs*, 357 Pa. 531, 533, 55 A.2d 402, 403 (1947), quoted in *Fierst v. Commonwealth Land Title Ins. Co.*, 499 Pa. 68, 75, 451 A.2d 674, 677 (1982). We believe that the right to "perform all matters and things, transact all business, execute and acknowledge all ... writings, assurances and instruments which may be ... proper to effectuate any matter or thing ... belonging to us" necessarily includes the right of Donald to act for the Father in matters involving the Debtor. *Cf. Pilsener Brewing, supra,* 79 F.2d at 67

(authorization to a creditors' committee to act as an attorney-in-fact for claimants in a composition proceeding accorded a right to the committee to act for those claimants in a bankruptcy proceeding).

The votes of Donald and Shine on behalf of FIT, in light of the invalidity of the contrary PP ballots, therefore constitutes acceptance of the Plan on behalf of Classes F and G. The votes of Donald, Shine, and the Father, per Donald, constitute acceptance of the Plan on behalf of Class H. Hence, each impaired class had accepted the Plan and the requirement of 11 U.S.C. § 1129(a)(8)(A) was satisfied. Similarly, the requirement of 11 U.S.C. § 1129(a)(7)(A)(i) has, at least at this juncture, been satisfied as well.

### 4. IN LIGHT OF THE LARGE POTENTIAL CLAIM OF ROYAL AGAINST THE DEBTOR, IT APPEARS THAT CHARLES, AS AN INTEREST-HOLDER IN THE DEBTOR, COULD WELL RECEIVE FAR LESS PROPERTY IF THIS CASE WERE CONVERTED TO A CHAPTER 7 CASE THAN IF THE PLAN WERE CONFIRMED.

■ Charles argues that the requirement of 11 U.S.C. § 1129(a)(7)(A)(ii) is not satisfied because, if the Debtor were sold as a going concern and if the primary lender (identified as PP) paid the $5.5 million loan guaranteed by the Debtor's real property, then Class G (general intercompany loans) would be paid in full. We have already concluded in the foregoing discussion, *see* page 963 *supra*, that FIT's vote is the only valid ballot cast in Class G, which appears to satisfy the requirement of § 1129(a)(7)(A)(i) as to Class G. However, assuming *arguendo* that the requirement of § 1129(a)(7)(A)(i) were not satisfied or that § 1129(a)(7)(A)(i) were interpreted to require the affirmative vote of PP to satisfy § 1129(a)(7)(A)(i), we nevertheless find

that the Plan satisfies the requirement of 11 U.S.C. § 1129(a)(7)(A)(ii).

We cannot agree with Charles that we can assume that the loan to Royal will in fact be paid by another entity. That other entity, in particular PP, is itself a debtor. Since the assets of the Debtor are valued, per Falconiero's reports admitted into evidence, at less than $2 million, it is apparent that Royal's enforcement of its rights against the Debtor under the $5.5 million loan guarantee in a Chapter 7 liquidation could wipe out all of the Debtor's assets. In this scenario, no class of interests junior to Royal, which includes all claims except that of Royal, would receive anything. In this potential scenario, the Plan proposes to pay considerably more to the junior (to Royal) class members than any of these classes would be certain to receive under a Chapter 7 liquidation.

### D. CONCLUSION

Having concluded that the Plan cannot be confirmed due solely to the Debtor's inability to satisfy the requirement of 11 U.S.C. § 1129(a)(10), we will enter an Order denying confirmation of this Plan, but allowing the Debtor to prepare a further amended Plan under a discrete timetable, *See In re Richard Buick, Inc.,* 126 B.R. 840, 855 (Bankr.E.D.Pa.1991).[5]

---

5. We find, upon our independent review of the Plan, that all other requirements for confirmation have been satisfied. *See Richard Buick, supra,* 126 B.R. at 846. Specifically, we find that the Plan easily clears the low threshold for establishing plan feasibility under 11 U.S.C. § 1129(a)(11). *See Orfa Corp. of Philadelphia,* 129 B.R. 404, 410–11 (Bankr.E.D.Pa.1991); and *Temple Zion, supra,* 125 B.R. at 915.