**In re MANOR PLACE DEVELOPMENT ASSOCIATES, L.P., South Florida Development Limited Partnership, a Florida Limited Partnership, Fairmor Development Corporation, a New Jersey Corporation, Centennial Associates Limited Partnership, Piscataway Associates, Diann E. Billing & Anders Bill-**

---

ing, individually and doing business as 65 Madison Avenue Associates, Boonton Building, Fairfield Development Company, Overlook Heights Development; Westgate at Fairfield and Great Brook Associates, Debtors.

Bankruptcy Nos. 89–04497 (NLW), 89–04499, 89–04501, 89–04502, 89–04495, 89–04498 and 89–04496.

United States Bankruptcy Court, D. New Jersey.

Sept. 11, 1992.

Bruce Frankel, Angel & Frankel, P.C., and Lewis Kaster, Carro, Spanbock, Kaster & Cuiffo, New York City, for Zirinsky Group.

Bruce Buechler, Ravin, Sarashon, Cook, Baumgarten, Fisch & Baime, Roseland, N.J., for Creditors' Committee.

Paul Hollander, Okin, Cohen & Hollander, Fort Lee, N.J., for Citizen's First Nat. Bank of New Jersey.

Dale Barney, Crummey, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., for First Fidelity Bank.

Philip Guarino, Ross & Hardies, Somerset, N.J., for debtors.

Michael Konig, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, N.J., for Howard Sav. Bank.

Mark D. Miller, Hannoch Weisman, Roseland, N.J., for Metropolitan Life Ins. Co.

## OPINION

NOVALYN L. WINFIELD, Bankruptcy Judge.

This matter came before the court at the confirmation hearing on the Debtors' and the Creditors' Committee's joint plan of reorganization.

After considering the oral argument of counsel, the pleadings and legal memorandum submitted by the parties, this court rendered its oral opinion on July 18, 1992. This constitutes the court's written opinion in accordance with said oral opinion. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). This court has juris-

diction in accordance with 28 U.S.C. § 1334 and the Standing Order of Reference dated July 23, 1984, and the venue is properly fixed in this Court pursuant to 28 U.S.C. § 1409.

## STATEMENT OF FACTS

The Debtors filed their Chapter 11 petitions on June 12, 1989. Shortly thereafter the court administratively consolidated the cases.[1] The Debtors are principally engaged in the business of ownership, management and development of commercial real estate. After over two years of proceedings and following extensive negotiations, the Debtors and the Creditors' Committee agreed and did file a joint plan of reorganization (the "Joint Plan"). The Joint Plan is presently pending before this court. A confirmation hearing was essentially conducted on June 17, 1992, in which all necessary findings for confirmation were made and objections to confirmation were resolved, save for the objection of the Zirinsky Group.[2]

The Joint Plan provides, *inter alia*, for distributions to be made to the unsecured creditors over time. In order to insure that the creditors' economic interests would not be harmed, the creditors, through the Creditors' Committee, bargained with the Debtors to obtain certain managerial rights over debtor and non-debtor partnerships. It is the Creditors' Committee's position that the right to manage the properties owned by the partnerships, including the right to receive management fees, and the right to have a voice in management insures value for the estates and their creditors. Toward that end, the Debtors and the Creditors' Committee agreed to the creation of a management committee. The management committee is proposed as a five member committee in which the Debtors will have two representatives, the Creditors' Committee will have two representatives, and the fifth member will be mutually agreed upon by the Debtors and the Creditors' Committee (the "Management Committee"). As set forth in Article 6 of the Joint Plan, the purpose of the Management Committee is to manage the Debtors' property and to exercise control over certain non-debtor property.[3]

The Zirinsky Group filed objections to confirmation of the Joint Plan which included an objection to the removal of Billing as managing general partner in non-debtor limited partnerships, Southgate Corporate Office Center ("Southgate") and Morristown Realty Associates ("Morristown Realty"), and the substitution of the Management Committee as the managing authority for those non-debtor partnerships.[4] Office Campus, Inc., a member of the Zirinsky Group, is the other general partner in both of the aforementioned limited partnerships. The Zirinsky Group vehemently argues that the proposed substitution of the Management Committee for Billing without its consent, and over its objection, is a clear violation of New Jersey Partnership Law and a violation of Section 365(c) of Chapter 11 of the Bankruptcy Code. Accordingly, says the Zirinsky Group, the Joint Plan cannot be confirmed under Bankruptcy Code Section 1129(a)(1), (2), (3) and (5)(A). However, the Zirinsky Group does not object to the provision of the Joint Plan that transfers Billings' economic rights in these non-debtor partnerships.[5]

In terms of these non-debtor partnerships, Morristown Realty and Southgate, it is important to recognize how the interests of the respective partners are structured. The interests of the partners in the two

---

1. Throughout the course of these bankruptcy proceedings, the consolidated cases have been referred to as "Lexington Gardens".

2. The "Zirinsky Group" consists of Office Campus, Inc., the Estate of Lawrence Zirinsky, Overlook Associates, Z Associates I, and Z Associates III.

3. See Article 6.03 of the Joint Plan set forth hereinafter.

4. Both Southgate and Morristown Realty are New Jersey Limited Partnerships.

5. The economic rights of Billing in the non-debtor partnership include not only Billing's right to his share of partnership profits, but also management fees earned from serving as the managing general partner.

partnerships as set out in Creditors' Committee papers were not objected to by the Zirinsky Group and are set forth below.

Morristown Realty has five partners: (i) Billing is a general partner with a 30% interest; (ii) Office Campus, Inc. is a general partner with a .5% interest; (iii) the Estate of Lawrence Zirinsky is a limited partner with a 29.5% interest; (iv) Overlook Associates is a limited partner with a 20% interest; and (v) Z Associates I is a limited partner with a 20% interest. The Estate of Lawrence Zirinsky controls and owns, either directly or through other entities, Office Campus, Inc. and Z Associates I. Billing controls Overlook Associates. Thus, Billing effectively owns 50% of Morristown Realty and the Zirinsky Group the other 50%.

Southgate has six partners: (i) Billing is a general partner with a 22.5% interest; (ii) Office Campus, Inc. is a general partner with a .375% interest; (iii) the Estate of Lawrence Zirinsky is a limited partner with a 22.125% interest; (iv) Overlook Associates is a limited partner with a 15% interest; (v) Z Associates III is a limited partner with a 15% interest; and (vi) Bell Communications Research is a limited partner with a 25% interest. The Estate of Lawrence Zirinsky either directly or through other entities owns and controls Office Campus, Inc. and Z Associates III. Accordingly, Billing has a 37.5% ownership interest in Southgate, the Zirinsky Group has a 37.5% ownership interest in Southgate, and Bell Communications Research (the tenant) owns the remaining 25%.

The Zirinsky Group in its objection points to the fact that the Zirinsky Group, Billing, and various Billing entities have been partners in these partnerships as well as others for over sixteen years. The affidavit of John Zirinsky ("Zirinsky") details the history and personal dealings of Billing and the Zirinsky Group.[6] Zirinsky states that the responsibilities for the partnerships' enterprises have always been divided, with Billing undertaking the building activity and Zirinsky assuming primary responsibility for the financing. Zirinsky notes that the

trust and working relationship between the parties has survived even a lengthy disagreement over Billing's use of Zirinsky/Billing partnership funds for Billing's separate ventures. Zirinsky professes to be satisfied with Billing's performance as managing general partner and his ability to interact with the Zirinsky Group in resolving partnership issues.

Members of the Zirinsky Group consider their strong personal relationship with Billing to have great significance in the upcoming lease negotiations with the sole tenant of the Morristown Realty premises. Zirinsky directs the court's attention to the "difficult realty market," and emphasizes the need for harmony among the partners. Likewise, Zirinsky points to sensitive lease negotiations with Bell Communications Research as to the Southgate property, and notes further that those negotiations involve the lender, as well. The Zirinsky Group emphasizes the personal nature of this business relationship with Billing by characterizing it as "a business marriage".

The Creditors' Committee on the other hand, pointedly observes that Billing's son has been acting as the managing general partner of Southgate and Morristown Realty for at least the last one and a half years. Impliedly they question the importance of Billing as the managing partner to the Zirinsky Group. Also, they claim by his agreement to the terms of the Joint Plan, Billing has only temporarily delegated his management function in Southgate and Morristown Realty to the Management Committee. They characterize this transfer of his managerial partnership rights as "a limited delegation, not an assignment". The thrust of their argument is that the delegation of the managerial function is limited in duration to the time period necessary to accomplish the payments proposed under the terms of the Joint Plan. Thus, the Creditors' Committee does not view this "limited delegation" as fundamentally disrupting or modifying the partnership agreements.

6. John Zirinsky is a co-executor of the estate of his father, Lawrence Zirinsky, deceased.

Both the Morristown Realty and Southgate partnership agreements contain clauses which provide that the consent of the other general partner must be obtained before a general partner can sell, assign or otherwise dispose of any part or all of the general partner's interest. The Creditors' Committee claims this clause to be unaffected by what it views as the limited delegation of Billing's managerial role. The contents of Article 6 of the Joint Plan must be examined to determine the scope of the authority contemplated for the Management Committee. The pertinent provisions of the Joint Plan are as follows:

*6.01* The management committee shall oversee, supervise, consult with and direct the activities of a property manager over whom the management committee will have the right to hire, fire and fix compensation. The property manager shall have limited authority to make repairs only up to $5,000. Any expenditure beyond $5,000 will require a majority vote of the management committee. Every three months the management committee will set the terms for leasing space (rental price, concessions, work letters, etc.). The management committee cannot act unless four of its five members are present at a meeting either in person or via telephone and all members of the management committee have received adequate written or telephonic notice of the meeting. The management committee shall continue to function until all the Debtors' obligation under the confirmed plan are fully discharged.

*6.02* The management committee may hire other professional persons such as real estate brokers, property managers, construction companies as necessary and determine the compensation to be paid.

*6.03* The management committee shall have control over all real property (other than the personal residence) in which Anders Billing and/or Diann Billing have any ownership interest or any partnership in which Anders and/or Diann Billing has an interest. If Anders and/or Diann Billing is the general partner of a non-debtor partnership, the management committee will exercise Anders and/or Diann Billing's managerial functions in that partnership in accordance with the partnership agreements, vote his vote and unsecured creditors shall receive the economic benefit of Anders and/or Diann Billing's partnership interest in the non-debtor partnership to the extent provided for under the terms of the plan.

*6.04* Any sale or refinancing of the Debtor properties or their interests in property in excess of $100,000 shall be approved and authorized by the management committee and on notice to all interested parties and after entry of an order by the Bankruptcy Court, unless the management committee unanimously agrees to do otherwise.

*6.05* The Debtors will not sell or refinance any properties during the duration of the plan without the written approval of the management committee.

*6.06* The duties of the management committee shall be to manage the operation of the Debtors' properties and other assets and interests in the partnerships (debtor and non-debtor) in order to protect these assets and maximize the cash flow from these assets for distribution to the unsecured creditors.

Thus, though perhaps limited in duration, the authority given to the Management Committee by the terms of the Joint Plan sweeps broadly and encompasses both debtor and non-debtor property.

## CONCLUSIONS OF LAW

This court finds that Article 6 as it applies to non-debtor partnerships violates Bankruptcy Code Section 365 and thus also violates Code Section 1129. Accordingly, the Joint Plan cannot be confirmed as proposed.

The issue before this court is whether the provision of the Joint Plan which purports to transfer Billing's management responsibilities in the non-debtor partnerships to the Management Committee is permissible under the Bankruptcy Code. For the purpose of addressing this issue, the parties appear to have assumed that the Morristown Realty and the Southgate Partner-

ship Agreements are executory contracts as to Billing, and thus are affected by the Bankruptcy Code. The court concurs in this assumption and notes that the courts that have addressed the issue have found partnership agreements to be executory contracts.[7] *See In re Cardinal Industries, Inc.*, 116 B.R. 964, 972–973 (Bankr. S.D. Ohio 1990) and the cases cited therein.

Code Section 365(c) provides that an executory contract cannot be assigned if applicable law excuses a non-debtor party to such contract from accepting performance from another and the non-debtor party does not consent.[8] Under the New Jersey General Partnership Law,[9] partners are deemed to have the following three distinct property rights: (i) a right in specific partnership property, (ii) an interest in the partnership generally, and (iii) a right to participate in partnership management. N.J.S.A. 42:1–24. General partnership law provides that a party who receives a conveyance of a partner's interest in a partnership is not entitled to "interfere in the management or administration of the partnership business or affairs," but it is merely entitled to "receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled." N.J.S.A. 42:1–27.

The Creditors' Committee, citing to the *Cardinal* case, properly notes that one of the estate's protected property interests is Billing's right to participate as a managing general partner in both Southgate and Morristown Realty. Analogizing the instant matter to the *Cardinal* case, the Creditors'

Committee would have this court find that the assumption by the Management Committee of Billing's role as managing partner in Southgate and Morristown Realty is not an assignment, and therefore not a violation of Section 365(c). However, the two cases are factually dissimilar. The corporate debtor, Cardinal Industries, Inc., either directly or through wholly owned subsidiaries, was in the business of managing and developing approximately 900 publicly syndicated real estate projects. Potentially at risk of loss in *Cardinal* were substantial economic rights as a result of the efforts by the limited partners to remove the Debtor from its managing partner role.[10] That is not true here. Indeed, Billing's ability to direct payment of his management fees from Southgate and Morristown Realty to his unsecured creditors is not contested by the Zirinsky Group. Moreover, the instant case involves two relatively small single asset limited partnerships in which the two general partners, Billing and Zirinsky, have a long personal relationship.

The court agrees with the Creditors' Committee that part of the *Cardinal* decision was premised on that court's determination that a operating trustee of a corporate Chapter 11 debtor was not a separate entity from the Debtor or a Debtor-in-Possession for purposes of Bankruptcy Code Section 365. The court stated quite clearly that "assumption [of the partnership agreement] by the trustee on behalf of the estate when performance is to be rendered by the

7. The court notes that while no motion to assume and/or assign an executory contract is before the court pursuant to Section 365, the Debtors' have the right to make such a request as a part of a plan for reorganization pursuant to Section 1123(b)(2).

8. 11 U.S.C. § 365(c) states:
   (c) The trustee may not assume or assign any executory contract ..., whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if—
   (1)(A) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to an entity other than the debtor in possession, whether or not such contract ...

or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment; ....

9. General partnership law applies to the Morristown Realty and Southgate limited partnerships to the extent not provided for by the limited partnership statute.

10. Limited partners in three separate partnerships sought relief from the automatic stay to remove the corporate debtor, Cardinal Industries, Inc., as the managing general partner of their respective partnerships. At the time the motion was filed, the debtor's operations were directed by a Chapter 11 operating trustee. The trustee opposed the lift stay motion.

Debtor for the benefit of the estate is not an assignment." *Id.* at 982.

However, a close examination of the *Cardinal* decision reveals that that court ruled on very narrow grounds. The court denied the motion for relief from stay to allow the limited partners to remove the debtor as a general partner. Importantly, in reaching its decision the court in *Cardinal* also engaged in the following analysis:

> And it is a balancing of the estate's right to determine whether to assume or reject its executory contracts against the rights of the nondebtor parties to those executory contracts that is at the heart of 11 U.S.C. § 365(c) and (e)(2). *If there is a material change* in the identity of the person rendering the performance under the contract, the identity of that person is an essential element of the contract and the contract is nonassumable under applicable nonbankruptcy law, then the estate cannot assume the contract. The reason for that result is that assumption other than by agreement may result in prejudicial harm to the nondebtor party. Where the Trustee's assumption, as the representative of the estate, would not change the essential identity of the entity performing the services under the contract, the exception is not effective. In that situation the nondebtor party is not prejudiced, nor is his essential bargain affected by the assumption. The Chapter 11 filing, therefore, should not provide a fortuitous event which excuses the nondebtor party from further performance if that performance is beneficial to the estate and if the estate can otherwise meet the tests for assumption. Certainly the nondebtor party should not be free to unilaterally terminate the estate's rights prior to its determination whether the contract will be assumed or rejected. The analysis would be different if an actual assignment to a separate third party were proposed or contemplated.

*Id.* at 981–82 (emphasis added).

Bearing the foregoing analysis in mind, this court cannot find that the Management Committee is the functional equivalent of the Debtor so that there is no material change in the identity of the person rendering performance under the contract. Based on the facts of this case, including the terms of the partnership agreements, this court finds that the identity of the managing partner in these non-debtor partnerships is an essential element of the partnership agreements, and that the court should not lightly tamper with such an essential element of a partnership agreement.

Although many of Billing's managerial responsibilities have apparently been performed by his son, it must be noted that the Zirinsky Group does not object, and apparently views its dealings with the son as equivalent to dealing with Billing. Treating Billing's son as having managerial authority is a far cry from interacting with a five member management committee, the members of which will be largely strangers to the Zirinsky Group. Moreover, the Management Committee will be obligated to operate under the terms of Article 6 of the Joint Plan in order to make a decision. The Zirinsky Group justifiably fears that such a process will prove to be time consuming and cumbersome, particularly with respect to upcoming sensitive lease negotiations. Moreover, it is possible that the short-term needs of the Management Committee to fulfill the terms of the Joint Plan may be at odds with the long-term best interests of the non-debtor partnerships. Any resulting dissension as to the management of the properties might very well be detrimental to the operation and value of the partnerships.

Although the delegation of Billing's authority proposed in the Joint Plan is limited in duration, it is virtually complete as to the scope of authority to be exercised over the management of non-debtor partnership property. We need only to look at the terms of Article 6 of the Joint Plan to apprehend the breadth of the proposed authority delegated to the Management Committee, and to reach the determination that the delegation is in fact an assignment that effects a material change prejudicial to the interests of the Zirinsky Group.

As noted in *In re Sunset Developers*, 69 B.R. 710, 711 (Bankr.D. Idaho 1987) and in *In re Sovereign Group, 1984–21 Ltd.*, 88 B.R. 325, 329 (Bankr.D.Colo.1988) a partnership agreement is a contract based upon personal trust and confidence. As further stated by the court in *Sovereign Group*, "the agreement among partners is unique in law because it is not only a legal relationship that is created but it reflects a personal relation or status somewhat akin to individuals in a marriage." *Id.* Undoubtedly in recognition of the special personal nature of a partnership, New Jersey Partnership Law at N.J.S.A. 42:1–27, specifically states that a party who receives a conveyance of a partner's interest in a partnership is not entitled to "interfere in the management or administration of the partnership business or affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but [is] merely entitle[d] ... to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled." N.J.S.A. 42:1–27. Thus, the proposed transfer of Billing's managerial authority to the Management Committee over the objection of The Zirinsky Group is inconsistent with New Jersey partnership law. Accordingly, this court finds that such a transfer of Billing's interest violates Bankruptcy Code Section 365(c)(1) in that applicable New Jersey law restricts such a proposed assignment and the Zirinsky Group does not consent to the assignment.

The court also finds the other case authority cited by the Creditors' Committee to be both factually and legally inapposite to the issues before this Court. For example, the Creditors' Committee cites *In re Ingleside Associates*, 136 B.R. 955 (Bankr. E.D.Pa.1992) for the proposition that a bankruptcy court can modify the terms of a partnership agreement through the plan process. In *Ingleside*, however, the agreement modified was an agreement pursuant to which the *debtor partnership* was formed and operated.[11] There was no attempt, nor did the case hold that the bankruptcy court could modify a non-debtor partnership agreement merely by reason of the fact that the debtor was a party to that agreement. Moreover, the issue before this court is whether the Creditors' Committee can compel the Zirinsky Group to accept performance from the Management Committee of Billing's fiduciary management responsibilities. This issue was not present in *Ingleside*.

In *In re Plunkett*, 23 B.R. 392 (Bankr. E.D.Wis.1982) the issue before the court was whether the debtor's right to manage an apartment complex and to receive a management fee were property of the estate under Section 541 of the Bankruptcy Code. *Id.* at 393. Five days after the debtor filed his Chapter 11 petition, investors in one of the partnership properties sought to remove the debtor as the managing partner of that property. The court found that the debtor's contractual rights created by the partnership agreement were property of the estate within the meaning of Bankruptcy Code Section 541, and therefore, the right to manage the property and receive the management fee was estate property. In the matter before this court no party contests the debtor's property interest in managing the non-debtor property and receiving the management fee for such efforts. The sole issue before this court is whether the right to act as a managing partner can be assigned in contravention of the partnership agreement and applicable state law. The holding in *Plunkett* does not reach this issue.

Likewise, the citation to *In re Hospitality Association of Tappen Zee, Ltd.*, 102 B.R. 369 (Bankr.S.D.N.Y.1989) is not on point. This case was cited by the Creditors' Committee for the proposition that a general partner, under New York law, can be removed by a court notwithstanding the language of a partnership agreement.

---

11. The court in *Ingleside* characterized the modification to the plaintiff's agreement as "mere clarifications necessary to allow the Debtor to function." *Ingleside*, 136 B.R. at 963. The modifications included the elimination of a partner if that partner failed to contribute to a capital call, and an allowance of authorized partners to execute documents on behalf of the partnership. *Id.* at 963. The court found that the modifications were neither substantial or unfair.

Even though this citation is to a bankruptcy court case, it is clear that it was in the United States District Court of New York where a limited partner obtained an order removing the general partner because the general partner had breached his fiduciary obligations to the partnership. There are no such allegations before this court.

This Court perceives from a review of the pertinent case law that where bankruptcy courts have modified partnership agreements their holdings have been on narrow grounds, and essentially to preserve the partnership Debtors' economic interests. But here the economic interests of the partnerships are not an issue. The Zirinsky Group does not deny Billing's right to assign his interest in profits and management fees from the non-debtor partnerships. Nor is there anything before the court that indicates that the Zirinsky Group has taken or will take any action to impair those rights. It appears that the Creditor's Committee believes that imposition of the Management Committee on the non-debtor partnerships will provide an extra measure of control over those assets which will insure that the funds needed for plan payments will be available. However, it is not readily apparent that such a management change is needed. Further, it unreasonably impairs the substantial rights of the Zirinsky Group. It would take from the non-debtor partnerships an element of "managerial predictability" and in its place leave "managerial uncertainty".

█ The Creditors' Committee further invites this court to modify the partnership agreements by exercising its powers under Bankruptcy Code Section 105. This court declines such an invitation. It is a generally accepted equitable maxim that equity must follow the law. Furthermore, "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed 2d 136 (1978). There are no federal inter-

ests present in this case to warrant this court to redefine the rights of the parties under the partnership agreements. Indeed, as noted by the Third Circuit in *Southern Railway Co. v. Johnson Bronze Co.* 758 F.2d 137, 141 (3d Cir.1985), Section 105 does not authorize the Bankruptcy Court to create rights not otherwise available under applicable law. It is one thing for a bankruptcy court to protect the economic interests of an estate, and quite another to abrogate a fundamental part of an agreement to which the debtor and non-debtors are parties.

Thus, for the reasons set forth herein, this court finds that the Joint Plan cannot assign Billing's managerial responsibilities in non-debtor partnerships, and thus it cannot confirm the Joint Plan as proposed. Counsel for the Creditors' Committee shall settle an order on notice to the other parties to this matter.